RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 05a0449p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

Nos. 03-1451/1621

KEVIN DAVIS (03-1451) and KEITH PRESLEY
(03-1621),

*Defendants-Appellants.*

>

---

Appeal from the United States District Court
for the Eastern District of Michigan at Detroit.
No. 00-80756—Avern Cohn, District Judge.

Argued: March 8, 2005

Decided and Filed: November 22, 2005

Before: MOORE and SUTTON, Circuit Judges; CARMAN, Judge.[*]

---

## COUNSEL

**ARGUED:** N.C. Deday LaRene, LaRENE & KRIGER, Detroit, Michigan, Richard J. Amberg, Keego Harbor, Michigan, for Appellants. Jennifer J. Peregord, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee. **ON BRIEF:** N.C. Deday LaRene, LaRENE & KRIGER, Detroit, Michigan, Richard J. Amberg, Keego Harbor, Michigan, for Appellants. Jennifer J. Peregord, ASSISTANT UNITED STATES ATTORNEY, Detroit, Michigan, for Appellee.

MOORE, J., delivered the opinion of the court, in which CARMAN, J., joined. SUTTON, J. (pp. 14-18), delivered a separate opinion concurring in part and dissenting in part.

---

## OPINION

---

KAREN NELSON MOORE, Circuit Judge. Defendants-Appellants Kevin Davis ("Davis") and Keith Presley ("Presley") were convicted of various drug and money-laundering offenses. On appeal Davis asserts that: (1) the district court erred in denying his motion to suppress certain evidence seized during searches of his vehicle, his home, and a storage locker; (2) the district court erred in refusing to allow him to cross-examine a government witness regarding an outstanding

---

[*]The Honorable Gregory W. Carman, Judge of the Court of International Trade, sitting by designation.

criminal charge; and (3) the district court erred in imposing consecutive sentences for each count on which Davis was convicted.  Presley argues on appeal that there was insufficient evidence to sustain his conviction for conspiracy to launder money.  Both defendants allege that:  (1) their sentences violate the Sixth Amendment in light of the Supreme Court's decision in *United States v. Booker*, 125 S. Ct. 738 (2005); (2) the district court erred in imposing a role-in-the-offense sentence enhancement pursuant to United States Sentencing Guidelines ("U.S.S.G.") § 3B1.1; and (3) the district court improperly calculated the drug quantity attributable to each defendant for sentencing purposes.

Upon review, we conclude that the seizure of Davis's vehicle violated the Fourth Amendment.  Therefore, the order of the district court denying Davis's motion to suppress evidence seized from the car is **REVERSED**, and we **REMAND** the case for further proceedings consistent with this opinion.  We **AFFIRM** Presley's conviction.  Finally, we **VACATE** both Presley's and Davis's sentences and **REMAND** the cases to the district court for resentencing in light of *Booker*.

## I. ANALYSIS

### A.  Factual History

Beginning in October 1998, the federal Drug Enforcement Agency ("DEA") began investigating a group of drug traffickers operating between Chicago, Illinois, and the Detroit, Michigan, area.  The individuals under investigation included Sidney Zanders, suspected by police of operating a large narcotics trafficking operation in the Detroit area, and Presley, believed by the DEA to be one of Zanders's cocaine suppliers in Chicago.  As part of the DEA's investigation, Cook County investigators began to conduct surveillance of Presley.

On December 30, 1998, Cook County investigators observed Presley meeting with a man named Christopher Trammel ("Trammel").  The investigators stopped Trammel after the meeting and recovered thirty kilograms of cocaine.  That same day, investigators observed Presley meeting with two other men.  The two men were then stopped and investigators found an additional sixty-five kilograms of cocaine in the men's possession.  As a result of these seizures, Cook County investigators executed a search warrant on a building in South Holland, Illinois, to which Presley was linked.  In the building, investigators discovered what was deemed "a repackaging plant for narcotics."  Joint Appendix ("J.A.") at 1100 (Mot. to Suppress Tr. at 67).  The investigators found, inter alia, cutting agents, presses capable of pressing one-kilogram packages, empty economy-size laundry detergent boxes, and mounds of detergent.  Then on approximately March 1, 1999, investigators observed Presley meeting with a woman named Holly Baskin-Spears ("Baskin-Spears") in Chicago.  Investigators had observed Presley meeting with her before.  After the meeting, the investigators stopped Baskin-Spears and discovered thirty-eight kilograms of cocaine in her vehicle.

On April 29, 1999, Cook County investigators followed a red Corvette, known to be Presley's, and a Range Rover with a Michigan license plate, to an Olympia Fields, Illinois, residential address.  The investigators later learned that Davis was the driver of the Range Rover.  Once at the residence, the investigators observed Presley conversing with a man they later learned was Davis in the driveway, though they could not hear what was being discussed.  At the time, Cook County investigators had had no previous encounters with Davis and did not know who Davis was.  The investigators also observed two Tide detergent boxes near the Range Rover.  Both men left the house and drove separately, Davis in the Range Rover and Presley in the red Corvette, east on Interstate 94 into Indiana.  The Corvette sped up and the investigators lost sight of the car, while other Cook County investigators continued to follow the Range Rover.

Cook County investigators notified Indiana State Troopers of their suspicion that the Range Rover was carrying contraband, and shortly after Davis crossed into Indiana at approximately 6:45 p.m., an Indiana State Trooper stopped Davis for speeding. Soon after Davis was stopped, the Cook County investigators who had been following Davis arrived on the scene. The investigators informed the trooper that they believed Davis was carrying narcotics in his vehicle. The Indiana trooper approached the Range Rover and asked Davis for his driver's license and car registration, which Davis gave to the trooper. The trooper then issued Davis a warning for speeding and asked whether Davis would consent to a search of his vehicle. Davis refused and asked whether he was free to leave. The trooper informed Davis that his Range Rover could not be moved, as the police were waiting for a drug-sniffing dog to be brought to the scene. The trooper offered, however, to give Davis a ride to the next service station on the highway. Davis declined the trooper's offer. Davis remained in the Range Rover throughout the stop and made several telephone calls on his cellular phone during the stop.

At approximately 7:00 p.m., Lake Station, Indiana, Canine Supervisor Tim Craigin ("Officer Craigin") was notified that a drug-sniffing dog was needed at the location. Officer Craigin arrived on the scene with his dog Rocky at approximately 7:15 p.m. Upon his arrival, Officer Craigin spoke with the officers on the scene and then walked Rocky around Davis's Range Rover. While Rocky showed some interest in the rear hatch area of the vehicle, Rocky did not alert positively to the presence of narcotics in the vehicle. Officer Craigin then placed Rocky back into his vehicle at approximately 7:30 p.m. and advised investigating police of the results of the search.

At approximately 7:20 p.m., DEA Special Agent Vince Balbo ("Agent Balbo") arrived on the scene and took charge of the investigation. From the record it is unclear whether Agent Balbo was aware of the fact that a drug-sniffing dog had already been used to search Davis's vehicle. Nonetheless, Agent Balbo contacted a neighboring county, Lake County, Indiana, to request that a drug-sniffing dog be sent to the scene. Lake County Deputy Murchek arrived on the scene at approximately 8:20 p.m. with his dog Sabor. Deputy Murchek took Sabor around the vehicle, and the dog alerted to the rear hatch area of the Range Rover. Indiana state police then obtained a search warrant for the Range Rover based on the surveillance observations and Sabor's alert. In obtaining this warrant, the Indiana trooper failed to inform the magistrate that the first dog failed to alert. During the search of the Range Rover, Indiana troopers seized $705,880 in cash contained in two Tide detergent boxes and one plain brown box along with numerous miscellaneous documents. Many of the documents were receipts in Davis's name for home improvements at 6960 Leslee Crest Drive, West Bloomfield, Michigan, which were paid for in cash.

Following the search and seizure of Davis's vehicle, a DEA agent executed a search warrant at Davis's residence at 6960 Leslee Crest Drive. At the residence, DEA agents discovered a receipt for the rental of a storage locker in the name of Tony Muhammad along with a key to a storage locker. The agents were able to find the storage locker matching the receipt and the key at a storage facility in Troy, Michigan. A DEA agent obtained a search warrant to search the storage locker. Upon a search of the storage locker, DEA agents discovered approximately $2 million in cash.

## B. Procedural History

On August 9, 2001, Presley, Davis, and several other codefendants were indicted in the United States District Court for the Eastern District of Michigan. Both Davis and Presley were charged with conspiracy to distribute and possession with the intent to distribute more than five kilograms of cocaine ("Count One"), and conspiracy to launder monetary instruments ("Count Twelve"). Davis was also charged with money laundering ("Counts Thirteen and Fourteen") and aiding and abetting another codefendant in money laundering ("Count Fifteen"). Presley was additionally charged with the use of a communication facility in committing a drug offense ("Count Two"). The indictment alleged that the defendants were involved in a large-scale drug trafficking

operation in which both defendants bought and sold large quantities of cocaine.  The indictment further alleged that as part of this operation, Davis would take proceeds from drug sales and purchase or lease real estate and vehicles in the names of nominee owners in order "to conceal and disguise the true nature, location, source, ownership, and control of the proceeds."  J.A. at 112 (Indictment at 6).

A jury trial was held, at the conclusion of which the jury found Presley guilty on Counts One, Two, and Twelve (the charges on which he was indicted) and found Davis guilty as to Counts One, Twelve, and Fifteen.  Davis was sentenced to concurrent terms of 240 months' imprisonment as to Counts One and Twelve and a consecutive term of 120 months' imprisonment on Count Fifteen, for a total sentence of 360 months' imprisonment.  Presley received concurrent sentences of imprisonment for 360 months, 48 months, and 240 months on each count respectively, for a total of 360 months' imprisonment.  Both defendants then filed timely appeals.

## II.  ANALYSIS

### A.  Motion to Suppress

Prior to trial, Davis filed a motion to suppress various pieces of evidence, including money and papers seized during the April 29, 1999 search of the Range Rover.  Davis contended that the police search of his vehicle following the traffic stop was impermissible under the Fourth Amendment.  Davis asserted that as a result of this allegedly illegal search, the searches of his home and the storage locker were also invalid.  The district court held a suppression hearing on the matter but ultimately held that the search of the Range Rover did not violate the Fourth Amendment.  The district court concluded that none of the law enforcement officers had probable cause to search the Range Rover at the time of the stop.  Nevertheless, the court decided that the law enforcement officers involved had reasonable suspicion that Davis was in possession of narcotics.  The court deemed this reasonable suspicion sufficient justification for the continued detention of Davis and the Range Rover for the period necessary to obtain the second dog's positive sniff and the search warrant.  Therefore, the district court concluded that neither the search of Davis's vehicle nor the subsequent searches of his home and the storage locker violated the Fourth Amendment.

Davis now asserts that the district court erred in reaching its conclusion concerning the search of the Range Rover.  Davis further contends that evidence seized during the searches of his home and the storage facility should also be suppressed under the "fruits of a poisonous tree" doctrine.  *See generally Wong Sun v. United States*, 371 U.S. 471 (1963).  Because we believe that the police lacked reasonable suspicion to detain Davis once the first drug-sniffing dog failed to alert, we agree that the search of Davis's vehicle violated the Fourth Amendment.

We review the district court's denial of Davis's motion to suppress under a mixed standard of review.  "We reverse the district court's findings of fact only if they are clearly erroneous, but review *de novo* the district court's legal conclusions."  *United States v. Akridge*, 346 F.3d 618, 622 (6th Cir. 2003), *cert. denied*, 540 U.S. 1203 (2004).  "Where, as here, the district court has denied [the defendant's] motion to suppress, we review the evidence in a light most favorable to the [g]overnment."  *Id.* at 622-23.

### 1.  Initial Stop

As a beginning matter, we conclude, and the defendant does not contest, that the initial stop of Davis's vehicle was lawful.  We have long held that "so long as the officer has probable cause to believe that a traffic violation has occurred or was occurring, the resultant stop is not unlawful and does not violate the Fourth Amendment."  *United States v. Bradshaw*, 102 F.3d 204, 210 (6th Cir. 1996) (internal quotation marks and citation omitted), *cert. denied*, 520 U.S. 1178 (1997).  The requirements of probable cause are satisfied "where 'the facts and circumstances within their (the

officers') knowledge and of which they had reasonably trustworthy information (are) sufficient in themselves to warrant a man of reasonable caution in the belief that' an offense has been or is being committed." *Brinegar v. United States*, 338 U.S. 160, 175-76 (1949) (quoting *Carroll v. United States*, 267 U.S. 132, 162 (1925)). If the particular officer has probable cause to believe that a traffic offense has occurred, the stop is permissible "regardless of whether this was the *only basis* or merely one basis for the stop." *Bradshaw*, 102 F.3d at 210 (internal quotation marks and citation omitted); *see also Whren v. United States*, 517 U.S. 806, 812-13 (1996).

Here, the Indiana State Trooper's observation of Davis speeding provided the police with probable cause initially to detain Davis for the limited purpose of issuing a traffic warning. Thus, it was constitutionally permissible for the Indiana State Trooper to pull over Davis's vehicle and detain him while a traffic warning was written and issued. It is immaterial, for purposes of the initial stop, that Cook County investigators were following Davis's vehicle at the time of the traffic violation. That the Indiana State Trooper had probable cause to believe that Davis was speeding was sufficient to justify the initial detention of Davis's vehicle.

The partial dissent argues that the Cook County investigators also had probable cause to stop Davis because they could properly conclude that there was a "fair probability that contraband or evidence of a crime [would] be found" in Davis's car. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). The argument is based primarily upon the following information: Davis met with Presley (who was a suspected drug dealer), others who had met with Presley had been found with drugs, and detergent boxes were present while Davis and Presley spoke. However, this improperly bases a finding of probable cause on "a person's mere propinquity to others independently suspected of criminal activity." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). We have held that "[a]lthough mere companionship with an individual suspected of criminal activity does not satisfy the probable cause standard, such association is 'part of the "practical considerations of everyday life" which can be considered in determining whether there is probable cause.'" *United States v. Padro*, 52 F.3d 120, 123 (6th Cir. 1995) (quoting *United States v. Wright*, 577 F.2d 378, 380 (6th Cir. 1978) (quoting *United States v. Harris*, 403 U.S. 573, 582-83 (1970))). In *Padro*, we noted that the individual in question was not only associating with a suspected criminal but was also "seen engaged in suspicious activities with him." *Id*. In contrast, Davis and Presley merely spoke in a residential driveway, and the police had no information regarding the nature of the conversation. The situation is analogous to *Sibron v. New York*, 392 U.S. 40, 62 (1968), in which the Court stated, "The inference that persons who talk to narcotics addicts are engaged in the criminal traffic in narcotics is simply not the sort of reasonable inference required to support an intrusion by the police upon an individual's personal security." According to the partial dissent's reasoning, almost anyone who spoke with Presley could be constitutionally stopped and searched by the police. While the presence of the detergent boxes may have correctly been a source of suspicion, this alone cannot justify stopping someone who merely engaged in a conversation with a suspected criminal.[1] To hold otherwise would be to ignore the basic rule that "a search or seizure of a person must be supported by probable cause particularized with respect to that person." *Ybarra*, 444 U.S. at 91.

---

[1]The cases cited by the partial dissent are not analogous to the factual scenario before us. In *United States v. Burton*, 288 F.3d 91, 95-99 (7th Cir. 2002), the defendant was observed leaving an apartment with a plastic bag, and there was substantial evidence to believe that a drug transaction was taking place in the apartment at that time. Similarly, both *United States v. Pace*, 898 F.2d 1218 (7th Cir. 1990), and *United States v. Valencia*, 913 F.2d 378 (7th Cir. 1990), involved clear evidence of an ongoing drug transaction at the time that the officers observed the defendants. In *Pace*, the court found that there was probable cause to arrest Pace and Besase because both men were "present in Savides' condominium with large amounts of cocaine and money lying in the open." *Pace*, 898 F.2d at 1240. The police officers in *Valencia* had ample evidence to conclude that the person in a specific apartment was the "money man" in a drug transaction, and thus there was probable cause to arrest Valencia when he was seen leaving the apartment shortly after another individual who had gone there to meet with the "money man." *Valencia*, 913 F.2d at 383-84. In contrast to these cases, we do not believe that the mere presence of detergent boxes — without any further information as to why Davis might have been meeting with Presley — supports a finding of probable cause.

## 2.  Detention After Initial Stop

Having concluded that the police had probable cause to stop Davis for a traffic violation, we must then ask whether it was constitutionally permissible for the police to detain Davis after a warning had been issued and the purpose of the traffic stop had been accomplished.  Probable cause to believe that a traffic violation has occurred is unlike probable cause to believe that a criminal violation has occurred and thus does not allow the police to detain a suspect indefinitely.  *See Knowles v. Iowa*, 525 U.S. 113, 116-18 (1998) (discussing the constitutional limitations of a traffic stop).  "We have held that [a]n ordinary traffic stop . . . is more akin to an investigative detention rather than a custodial arrest, and the principles announced in *Terry v. Ohio*, 392 U.S. 1 (1968), apply to define the scope of reasonable police conduct."  *United States v. Bailey*, 302 F.3d 652, 657 (6th Cir. 2002) (internal quotation marks and citation omitted).  Thus, "any subsequent detention after the initial stop must not be excessively intrusive in that the officer's actions must be reasonably related in scope to circumstances justifying the initial interference."  *United States v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999), *cert. denied*, 528 U.S. 1176 (2000).  Once the purpose of the initial traffic stop is completed, an officer cannot further detain the vehicle or its occupants unless something happened *during the stop* to cause the officer to have a "reasonable and articulable suspicion that criminal activity [is] afoot."  *Id.*; *see also Bailey*, 302 F.3d at 657-58; *United States v. Erwin*, 155 F.3d 818, 823 (6th Cir. 1998) (en banc), *cert. denied*, 525 U.S. 1123 (1999).

*Terry*, a limited exception to the normal requirements of probable cause, permits a police officer briefly to detain a person or property for investigative purposes if the officer has a reasonable suspicion, supported by articulable facts, that criminal activity has occurred or is about to occur.  *Farm Labor Org. Comm. v. Ohio State Highway Patrol*, 308 F.3d 523, 543-44 (6th Cir. 2002).  In evaluating the constitutionality of a *Terry* stop, we engage in a two-part analysis of the reasonableness of the stop.  We first ask "whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion."  *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993) (internal quotation marks and citation omitted).  In answering this question, we examine the totality of the circumstances to determine the reasonableness of the investigatory stop.  *Bailey*, 302 F.3d at 658 (citing *United States v. Arvizu*, 534 U.S. 266 (2002)).

Next, if we conclude that the basis for the *Terry* stop was proper, then we must determine "whether the degree of intrusion . . . was reasonably related in scope to the situation at hand, which is judged by examining the reasonableness of the officials' conduct given their suspicions and the surrounding circumstances."  *Garza*, 10 F.3d at 1245 (internal quotation marks and citation omitted).  As part of the second prong, we must "ascertain whether the detention is reasonable, that is, (1) was it sufficiently limited in time, and (2) were the investigative means used the least intrusive means reasonably available."  *Bennett v. City of Eastpointe*, 410 F.3d 810, 825-26 (6th Cir. 2005) (internal quotation marks and citation omitted).  For while a *Terry* stop may be constitutionally permissible initially, it may become an impermissible "seizure if it occurs over an unreasonable period of time or under unreasonable circumstances."  *United States v. Orsolini*, 300 F.3d 724, 729-30 (6th Cir. 2002) (internal quotation marks and citation omitted); *see also United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001) (citing *United States v. Place*, 462 U.S. 696, 709 (1983)) (noting that "the Supreme Court has held that the passage of time can cause an investigative detention to ripen into a defective seizure that must be based upon probable cause").  Simply put, "an investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop."  *Florida v. Royer*, 460 U.S. 491, 500 (1983).  While there is "no rigid time limitation on the lawfulness of a *Terry* stop" (citation and internal quotation marks omitted), we must "'examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant.'"  *Orsolini*, 300 F.3d at 730 (quoting *United States v. Sharpe*, 470 U.S. 675, 687 (1985)).

Davis concedes, and we agree, that the police had reasonable suspicion to detain Davis for the additional approximately thirty to forty-five minutes it took for the police to bring the first drug-sniffing dog to the scene and have the dog check the vehicle for the presence of narcotics. At the time that Davis was stopped for speeding, it was reasonable for the police to suspect, based on articulable facts, that Davis's vehicle contained narcotics. Shortly before the stop, the police had observed Davis meeting with Presley, whom Cook County investigators suspected was a drug dealer. Past experience indicated to the investigators that individuals who met with Presley were likely to be in possession of large amounts of narcotics. In the several months before the stop of Davis's vehicle, law enforcement agents stopped four individuals on three separate occasions after the individuals met with Presley. Each time such a detention occurred, Cook County investigators discovered large amounts of cocaine in the individual's possession.

During Davis's meeting with Presley, Cook County investigators observed economy-size laundry detergent boxes near the Range Rover. While it was unclear prior to the search of the Range Rover what happened to the detergent boxes after Presley and Davis parted company, the investigators had reason to suspect that the detergent boxes were related to narcotics dealings. Only a few months earlier, Cook County investigators had searched a building connected with Presley and discovered numerous items used in repackaging narcotics, including several economy-size laundry detergent boxes.

Finally, Cook County investigators had been investigating Presley and others connected with him because they believed that Presley was involved with a narcotics ring that transported drugs between Chicago and Detroit. At Davis's meeting with Presley, the investigators observed that the Range Rover had a Michigan license plate. Furthermore, the investigators followed Davis as he drove east on Interstate 94 out of Illinois, into Indiana, and in the direction of Michigan. Davis's license plate and his direction of travel suggested to the investigators that he might have some involvement in transporting narcotics from Chicago to Detroit. Examining the totality of the circumstances known to the investigators at the time of Davis's initial detention, the investigators had sufficient reason to suspect that Davis was transporting narcotics in his vehicle to justify an additional delay of Davis's vehicle to allow further police investigation. The Cook County investigators requested that the Indiana State Troopers stop Davis for speeding, and the Indiana troopers had sufficient justification for their further investigation based on the information provided by the investigators.

Having determined that there was at the outset sufficient reasonable suspicion for the Indiana troopers initially to detain Davis following the completion of the traffic stop, we must consider whether the seizure was sufficiently limited in time and whether the investigative means were "minimally intrusive." *United States v. Place*, 462 U.S. 696, 706 (1983). The use of the first drug-sniffing dog was a minimally intrusive means of investigating whether the officers' suspicions that Davis's vehicle contained narcotics were valid. The use of the first drug-sniffing dog, by itself, did not encroach upon Davis's reasonable expectation of privacy. *See Illinois v. Caballes*, 125 S. Ct. 834, 837-38 (2005) (noting that where the use of a drug-sniffing dog did not extend the length of a traffic stop, no Fourth Amendment concerns were implicated). There is also no evidence in the record that the additional approximately thirty-minute delay of Davis and his vehicle while the first drug-sniffing dog was located and procured was unreasonable in light of the officers' reasonable suspicions. Thus, the use of a well-trained drug-sniffing dog that was brought to the scene within a reasonable period after the initial traffic stop was a permissible means of determining whether the police were correct to suspect that Davis was in possession of narcotics.

Once the drug-sniffing dog was brought to the scene and failed to alert positively to the presence of narcotics in the vehicle, the officers' suspicions that Davis was in possession of narcotics were dispelled. Drug-sniffing dogs are highly trained to detect the presence of narcotics, and the dog Rocky did not detect any narcotics in the car. Office Craigin, Rocky's handler, noted

during the suppression hearing that Rocky was a qualified, trained, and certified dog. Rocky had been in service as a drug-sniffing dog for approximately three years prior to Davis's stop and underwent training on a continual basis. Officer Craigin testified that Rocky's success rate at accurately identifying the presence of narcotics was over ninety percent. Based upon this information, there were no grounds for the police to continue to believe that the vehicle contained narcotics after Rocky failed to alert. We note that the partial dissent's arguments regarding the effect of a dog's failure to alert do not change this analysis. The partial dissent cites to several cases for the proposition that an investigatory dog's failure to alert does not dispel probable cause. *See, e.g.*, *United States v. Jodoin*, 672 F.2d 232, 236 (1st Cir. 1982) ("The dog's failure to react does not, in our view, destroy the 'probable cause' that would otherwise exist. It is just another element to be considered by the magistrate."). However, in the cases cited the courts determined that even without the dog's alert there was probable cause to justify a more extended detention, whereas in this case there was only the more limited basis of reasonable suspicion.

Given that the police had no reason to continue to suspect that Davis possessed narcotics, delaying Davis's vehicle an additional hour in order to permit a second examination of the vehicle by another drug-sniffing dog was unreasonable. The use of the second dog and the continued detention of Davis's vehicle served no investigatory purpose. *See Sharpe,* 470 U.S. at 685 (emphasizing "the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes"). The police already had confirmation from Rocky that no narcotics were in the vehicle. Thus, to delay Davis another hour in order to permit a second search of the vehicle simply delayed the release of Davis and his vehicle without any investigatory purpose. Such a delay is specifically prohibited by the Fourth Amendment. *See Heath*, 259 F.3d at 530 (indicating that once officers use "all appropriate means available to them to allay their concerns of criminal activity" they may not detain a suspect absent probable cause); *United States v. Butler*, 223 F.3d 368, 375 (6th Cir. 2000). We therefore must conclude that this additional delay was unreasonable and violated Davis's Fourth Amendment rights.

We have repeatedly held that a detention of property based upon reasonable suspicion may continue only for so long as it takes the officer to prove or disprove those suspicions. Thus, in *Farm Labor*, we found unreasonable and, therefore, unconstitutional the seizure of motorists' green cards for four days where law enforcement agents suspected the green cards to be fraudulent. *Farm Labor*, 308 F.3d at 544-48. The district court concluded, and we agreed, that one day or less was needed for the officer to contact and receive verification from the INS as to the cards' authenticity. *Id.* at 546-47. Therefore, the officers' seizure of the green cards for an extra three days was impermissible under *Terry*. *Id.* Similarly, in *Bennett*, we held that the seizure of two bicycles was unreasonable under the Fourth Amendment. *Bennett*, 410 F.3d at 825-26. In *Bennett*, the police suspected that the two bicycles were stolen, and thus ran the bicycles' serial numbers through the LEIN system.[2] When the system indicated the bicycles had not been reported stolen, the police nonetheless decided to seize the bicycles. We held that, because seizure of the bicycles served no investigatory purpose once the police had determined the bicycles had not been reported stolen, the seizure was an unconstitutional *Terry* stop. *Id.* at 825-27.

As in *Farm Labor* and *Bennett*, the additional hour detention of Davis's vehicle served little, if any, investigatory purpose. In both cases the officers' continued detention of the personal effects beyond the reasonable amount of time needed to conduct an investigation was held to be unacceptable. Just as the LEIN search in *Bennett* informed the officers that the bicycles were not stolen, Rocky's sniff indicated there were no narcotics in the vehicle. Similarly, in this case the

---

[2]The Michigan Law Enforcement Information Network ("LEIN") is an electronic compilation of criminal justice information available for the use of specific authorized state officials and agencies.

officers' continued detention of Davis's vehicle solely for the purpose of obtaining another drug-sniffing dog was unreasonable.

To allow police to delay further a suspect for the purpose of obtaining another drug-sniffing dog, whether intentionally or as the result of miscommunication,[3] where the first dog failed to alert positively gives law enforcement power that comes only with probable cause. The Fourth Amendment allows police to detain a suspect on reasonable suspicion only for as long as it takes for the police to test the validity of their suspicions. Reasonable suspicion, a limited exception to the probable-cause requirement, does not permit unlimited bites at the apple. Officers must act to confirm or dispel their suspicions quickly. While they may be disappointed when their chosen investigatory technique dispels their suspicions, the Fourth Amendment does not permit them to keep trying until they obtain the desired results. To hold otherwise would permit the *Terry*-stop exception to engulf the general Fourth Amendment prohibition against search and seizure absent probable cause. We thus hold that the officers' detention of Davis's vehicle for the purpose of obtaining a second drug-sniffing dog violated the Fourth Amendment.

### 3.  Later Warrant Does not Cure Constitutional Defect

Having determined that the seizure of Davis's vehicle violated the Fourth Amendment, we must consider whether the evidence obtained from the vehicle following the seizure must be suppressed. Specifically, we must determine whether the officers' procurement of a warrant prior to searching the vehicle cured any constitutional defect that occurred prior to the search. We hold that the search of Davis's vehicle was tainted by the illegal seizure, and thus the search warrant was insufficient to overcome this constitutional defect.

Having determined that the search warrant included illegally obtained information, in this case the second drug-sniffing dog's positive alert, we must remove this fact from the affidavit when considering whether there is still sufficient information to establish probable cause to search the vehicle. *See United States v. Bishop*, 264 F.3d 919, 924 (9th Cir. 2001); *United States v. Reilly*, 76 F.3d 1271, 1282-83 n.2 (2d Cir. 1996). Moreover, we must also consider a material fact omitted from the affidavit by the affiant — the fact that the first drug-sniffing dog failed to alert to the presence of narcotics in the vehicle. When the facts are then considered, it is clear that there was insufficient cause to support the issuance of the warrant. At the time the warrant was sought, the police had no knowledge of who Davis was or where he was going. The only information that the police had was that: (1) Davis had met earlier with an individual the police suspected of being a drug dealer; (2) there was reason to suspect that narcotics may have been involved in the meeting because of the observation of a large laundry detergent box at the meeting (although importantly police surveillance did not indicate what happened to the detergent box at the meeting's conclusion); and (3) a drug-sniffing dog brought to the scene failed to alert positively to the presence of narcotics in the vehicle. Examining these facts in their totality, there is insufficient information to establish probable cause for the issuance of a warrant to search Davis's vehicle. All that a neutral and detached magistrate could glean from this evidence is that the police initially had reason to believe that Davis had narcotics but that this theory was proved false by the first drug-sniffing dog's examination of the car. The search warrant was therefore insufficient to cure the illegal seizure of

---

[3]There is a dispute in the record as to whether Agent Balbo was aware of the first dog sniff when he requested a second dog sniff of the vehicle. For Fourth Amendment purposes, Agent Balbo's subjective knowledge at the time of the second dog sniff is immaterial. The material fact is that Davis was unreasonably delayed an additional hour with little, if any, investigative rationale.

Davis and his vehicle.**4** We thus hold that the district court erred in failing to suppress the evidence obtained as a result of that search.

### 4. Admissibility of Other Searches

Having determined that the search of Davis's vehicle violated the Fourth Amendment, and therefore that the district court erred in denying Davis's motion to suppress evidence seized during the search, we remand the case to the district court for a determination as to whether Davis's conviction still stands. The district court must consider whether evidence seized during the other searches was the fruit of a poisonous tree, *see Wong Sun v. United States*, 371 U.S. 471 (1963), or whether there are exceptions to this exclusionary rule under which the evidence seized from Davis's home and the storage locker is admissible. *See Murray v. United States*, 487 U.S. 533, 537 (1988) (explaining that under the independent-source rule, even if the police engage in illegal investigatory activity, evidence will be admissible if it was discovered through a source independent from the illegal police activity); *Nix v. Williams*, 467 U.S. 431, 443-44 (1984) (noting that under the rule of inevitable discovery, the court may admit illegally obtained evidence if the evidence inevitably would have been discovered through independent, lawful means).

## B. Sufficiency of the Evidence

Presley contends that the government failed to introduce sufficient evidence at trial to support his conviction for conspiring to launder money. In addressing such a challenge we must determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original). In making this determination we draw all inferences and resolve all issues of credibility in the government's favor. *United States v. Abdullah*, 162 F.3d 897, 903 (6th Cir. 1998). Additionally, where, as here, the defendant fails to make a motion for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29 before the district court, we may not disturb the jury's verdict absent a showing of a "manifest miscarriage of justice." *Id.* (internal quotation marks and citation omitted). Such a showing exists "only if the record is 'devoid of evidence pointing to guilt.'" *Id.* (citation omitted).

No such miscarriage of justice is present in this case. Presley contests his conviction pursuant to 18 U.S.C. § 1956(h), which prohibits individuals from conspiring to commit money laundering in violation of 18 U.S.C. § 1956 or § 1957. Most relevant for our purposes, a violation of 18 U.S.C. § 1956(a)(1)(B)(i) requires proof of:

> (1) use of funds that are proceeds of unlawful activity; (2) knowledge that the funds are proceeds of unlawful activity; and (3) conduct[ing] or attempt[ing] to conduct a financial transaction, knowing that the transaction is designed in whole or in part to disguise the nature, location, source, ownership or control of the proceeds.

*United States v. Prince*, 214 F.3d 740, 747 (6th Cir. 2000) (quotation and citation omitted).

In this case there is sufficient evidence on the record before us to conclude that no miscarriage of justice occurred. There is ample evidence in the record to indicate that Davis engaged in money laundering by using drug proceeds to purchase or lease real estate and vehicles

---

**4**The Government does not argue that this case falls under the good-faith defense set forth in *United States v. Leon*, 468 U.S. 897 (1984). Moreover, we agree with the numerous other circuits that have held that the *Leon* good-faith exception is inapplicable where a warrant was secured in part on the basis of an illegal search or seizure. *See United States v. Reilly*, 76 F.3d 1271, 1282 (2d Cir. 1996) (collecting cases); *United States v. Bishop*, 264 F.3d 919, 924 n.2 (9th Cir. 2001).

through the use of nominee owners in order to conceal the source of money. Additionally, there is evidence to suggest that Davis had access to drug proceeds belonging to Presley. Evidence was introduced at trial showing that Presley, under the fictitious name of Tony Muhammad, rented a storage locker in which over $2 million in cash was found. The record also indicates that Davis was involved in the renting of this storage locker as both a key to the locker and a rental receipt for it were found at Davis's home. Finally, there is evidence in the record indicating that Presley sold Davis large quantities of cocaine. Given this evidence, it would not be a miscarriage of justice for a jury to infer that Presley and Davis were involved not only in a conspiracy to distribute cocaine but also in a conspiracy to launder money. *See generally United States v. Bencs*, 28 F.3d 555, 562 (6th Cir. 1994) (analyzing a claim of insufficiency of the evidence in a case of alleged money laundering), *cert. denied*, 513 U.S. 1117 (1995). We therefore reject Presley's sufficiency-of-the-evidence claim.

Presley's sufficiency claim is also unaffected by our holding that the search of Davis's vehicle violated Davis's Fourth Amendment rights. While the evidence seized from the storage locker and Davis's house may have been erroneously admitted as part of the prosecution's case against Davis, the admission of this evidence as part of the prosecution's case against Presley was constitutionally permissible. Because "the Fourth Amendment protects people, not places," *Katz v. United States*, 389 U.S. 347, 351 (1967), a defendant has standing to challenge the admission of evidence only if the defendant's own constitutional rights have been violated. *United States v. Salvucci*, 448 U.S. 83, 86-87 (1980). In cases involving Fourth Amendment violations, we determine standing by deciding whether a defendant can establish "a legitimate expectation" of privacy in the area searched or the items seized. *Minnesota v. Carter*, 525 U.S. 83, 91 (1998); *United States v. Talley*, 275 F.3d 560, 563 (6th Cir. 2001); *United States v. King*, 55 F.3d 1193, 1195 (6th Cir. 1995). In this case, the search of Davis's residence and the storage locker may be constitutionally impermissible as a result of the search of Davis's vehicle in violation of Davis's Fourth Amendment rights. Presley cannot establish, however, that the search of Davis's vehicle violated Presley's Fourth Amendment rights. Presley has no reasonable expectation of privacy either in Davis's vehicle or in the items seized from Davis's vehicle, because he "had neither a property nor possessory interest" in them. *United States v. Pino*, 855 F.2d 357, 360 (6th Cir. 1988), *cert. denied*, 493 U.S. 1090 (1990). In fact, Presley denied having any association with the evidence recovered from Davis's car. Therefore, Presley has no standing to challenge the search of Davis's vehicle or to argue that subsequent searches were tainted by this initial search. Thus, our ruling on Davis's motion-to-suppress claim does not affect the sufficiency of the evidence against Presley. We therefore reject Presley's sufficiency-of-the-evidence claim.

## C.  Cross-Examination

At trial, one of the main witnesses who testified against Davis was Thomas Patrick ("Patrick"). Prior to Davis's arrest, Patrick assisted Davis in his drug operations and also acted as Davis's general assistant. On cross-examination, Davis's defense counsel attempted to discredit Patrick's testimony by questioning Patrick as to his criminal history and any benefits he might receive from the government in exchange for his testimony against Davis. Along these lines, Davis's defense counsel sought to suggest that Patrick was induced to testify in favor of the government in exchange for the government having declined to turn Patrick over to local authorities on a ten-year-old outstanding warrant stemming from a state drug case. The prosecution objected to this line of questioning, and the district judge sustained the prosecution's objection on the grounds that there was no evidence suggesting that the government was even aware of the existence of the outstanding warrant. Davis asserts that the district judge's ruling impermissibly limited his right to cross examine Patrick. We disagree with Davis's assertion.

Although a defendant is guaranteed the right to confront the witnesses against him, this right is not absolute. *Norris v. Schotten*, 146 F.3d 314, 329 (6th Cir.), *cert. denied*, 525 U.S. 935 (1998).

"Trial judges retain great discretion to impose reasonable limits on the cross-examination of witnesses based on concerns such as harassment, prejudice, confusion of the issues, the witness's safety, and marginal relevancy." *Id.* at 329 (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)); *see also* FED. R. EVID. 611. In this case, the district court did not abuse its discretion by limiting defense counsel's cross-examination of Patrick.

Defense counsel asserts that the line of questioning limited by the district court would have shown that Patrick was biased in favor of the government because of the benefits Patrick was receiving in exchange for his testimony. Yet, we doubt that the line of questioning sought by defense counsel was more than marginally relevant as to bias. As the district court correctly pointed out, there was no evidence that the government was aware that the outstanding warrant existed prior to Patrick's testimony. Indeed, the prosecution indicated at trial that it had no knowledge of the warrant's existence before defense counsel's questioning began. Given this lack of knowledge by the government, Davis's defense counsel demonstrated no link between Patrick's testimony and the government's failure to turn Patrick over to local authorities. As a result, the line of questioning sought by defense counsel was only marginally relevant. We thus conclude that the district court did not abuse its discretion by limiting defense counsel's cross-examination of Patrick as to this matter.[5]

## D. *Booker* Claims

Both Presley and Davis contend that their sentences violate the Sixth Amendment in light of the Supreme Court's decision in *Booker*, 125 S. Ct. 738. In view of *Booker*, we conclude that Presley's and Davis's Sixth Amendment rights have been violated and that we must vacate their sentences and remand the cases to the district court for resentencing.

As both defendants failed to raise any Sixth Amendment claim before the district court, we may notice their claims only if they constitute plain error. *United States v. Oliver*, 397 F.3d 369, 375 (6th Cir. 2005). Plain error is defined as "(1) error, (2) that is plain, and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Johnson v. United States*, 520 U.S. 461, 467 (1997) (internal quotation marks and citations omitted).

The claims raised by Presley and Davis as to the constitutionality of their sentences are analytically identical to the claims raised by defendants in *Oliver* and *United States v. McDaniel*, 398 F.3d 540 (6th Cir. 2005). As in *Oliver* and *McDaniel*, the district court here relied on judge-found facts to impose sentencing enhancements that could not have been imposed solely based on facts found by the jury beyond a reasonable doubt. Both Davis's and Presley's sentences were increased based upon facts not found by the jury, such as the quantity of drugs attributable to each defendant and their role in the offense. Such a use of judge-found facts to impose sentence enhancements under the then-mandatory United States Sentencing Guidelines is in direct contravention of the Supreme Court's decision in *Booker. Booker*, 125 S. Ct. at 769 (remanding for resentencing where Booker's sentence under the U.S.S.G. was based on judge-found facts). We found this type of error to satisfy the plain-error standard in both *Oliver* and *McDaniel. Oliver*, 397 F.3d at 380-81; *McDaniel*, 398 F.3d at 550-51. We therefore follow the logic of those decisions in

---

[5] Our conclusion that the district court did not abuse its discretion is supported the fact that the district court permitted defense counsel to cross examine Patrick as to other benefits he was receiving from the government in order to highlight Patrick's bias in favor of the government. *See United States v. Kone*, 307 F.3d 430, 436 (6th Cir. 2002) (indicating that there is no abuse of discretion where "despite the limitation of cross-examination, the jury was otherwise in possession of sufficient information . . . to make a discriminating appraisal of a witness' motives and bias") (bracketing, internal quotation marks, and citation omitted).

concluding that both Presley's and Davis's claims satisfy the necessary conditions for plain-error review, and we exercise our discretion to entertain these claims on appeal. We must thus remand Presley's and Davis's cases to the district court for resentencing. *See Oliver*, 397 F.3d at 381.

The defendants raise other sentencing claims, alleging that the district court erred in imposing a role-in-the-offense sentence enhancement pursuant to U.S.S.G. § 3B1.1, and that the district court improperly calculated the drug quantity attributable to each defendant for sentencing purposes. We need not address these claims now given that the district court must reconsider the defendants' sentences in their totality upon remand. It would be unnecessary for us to consider whether, for example, the district court properly calculated the quantity of drugs attributable to each defendant given that this quantity may change upon resentencing as a result of this opinion. Instead, we urge the district court to consider carefully and document the appropriate guideline range to be considered as part of resentencing. If after resentencing the defendants still believe their sentences to be erroneous they may challenge their sentences on appeal.

## III.  CONCLUSION

For the reasons discussed above, the order of the district court denying Davis's motion to suppress evidence seized from the car is **REVERSED**, and we **REMAND** the case for further proceedings consistent with this opinion. We **AFFIRM** Presley's conviction. Finally, we **VACATE** both Presley's and Davis's sentences and **REMAND** the cases to the district court for resentencing in light of *Booker*.

---

**CONCURRING IN PART, DISSENTING IN PART**

---

SUTTON, Circuit Judge, concurring in part and dissenting in part. I concur in the majority's resolution of Keith Presley's sufficiency-of-the-evidence claim (Part II.B), in its resolution of Kevin Davis's Sixth Amendment claim (II.C) and in its resolution of the various sentencing issues that both defendants raise (II.D). Although I find much with which to agree in the majority's analysis of Davis's Fourth Amendment claim, I believe that the officers had probable cause to stop Davis and search his car and that this probable cause did not dissipate over the course of the encounter. I therefore respectfully dissent from Part II.A of the opinion.

Let me start by emphasizing my agreement with the majority. I agree that the initial stop of Davis's automobile was lawful. I agree that, once the officers had stopped Davis's vehicle, they needed probable cause, but nothing more, to search Davis's Range Rover under the automobile exception to the warrant requirement. *See Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996). I agree that if the officers had just "reasonable suspicion" to search Davis's car, *see Terry v. Ohio*, 392 U.S. 1 (1968), the "investigative detention" should have been "temporary" and should have "last[ed] no longer than is necessary to effectuate the purpose of the stop," *Florida v. Royer*, 460 U.S. 491, 500 (1983). I agree that the government would be hard-pressed to satisfy the reasonable-suspicion standard in this case, given the 90-minute delay before Sabor, as opposed to Rocky, alerted to Davis's rear hatch and the officers procured a warrant. *See United States v. Place*, 462 U.S. 696, 709–10 (1983). And I generally agree that, in the context of a dog sniff performed after the officers have reasonable suspicion that a vehicle contains contraband, the police have no more right to get a second opinion (whether advertently or not) than a criminal suspect does.

My problem is that when the officers initially detained Davis, they had probable cause, not reasonable suspicion, that Davis was involved in drug trafficking. As with many criminal investigations, the relevant timeline for analyzing the Fourth Amendment claim begins well before the officers observed Davis and Presley meet on April 29, 1999. Through the winter of 1998–1999, Chicago police officers, led by 25-year veteran Sergeant Patrick Scanlon, conducted surveillance of Presley and stopped four individuals with whom Presley met, finding cocaine packaged in large boxes on each occasion. On December 30, 1998, officers stopped Christopher Trammell after he had met with Presley, discovering 30 kilograms of cocaine in his vehicle. On the same day, officers stopped Elix Duncan and Kenneth Dunlap after they met with Presley and found 65 kilograms of cocaine. In March of 1999, officers stopped Holly Baskins-Spears after she met Presley and seized 38 kilograms of cocaine. On the basis of the first two searches, the officers obtained a search warrant for a building in South Holland, a suburb of Chicago, where they found cutting agents, presses for making kilogram packages, empty industrial size soap detergent boxes of Tide and Arm & Hammer and a mound of seemingly discarded laundry detergent on the floor.

By the time that investigators with the Cook County State's Attorney's Narcotics Strike Force observed Davis and Presley on April 29, 1999, in other words, they had already witnessed Presley meet with four individuals who were later stopped and found possessing cocaine in large quantities and, so far as the record reveals, they had never once stopped an individual who met Presley and was later found *not* to be possessing cocaine. Then, on April 29, the Cook County investigators saw Davis's silver 1999 Range Rover following Presley's car. The investigators then "observed those two vehicles take different routes to a[] [home] in [the Chicago suburb of] Olympia Fields," JA 1102, 1494, where investigators saw Davis meet Presley in the driveway of the home at about 6:00 p.m. During the course of their observations, the investigators saw two Tide boxes—boxes that connected this encounter to the drug packaging materials that the police had earlier found at the South Holland drug house—"on the hood or tailgate" of Davis's Range Rover,

with Presley and Davis standing nearby. JA 363. When the police stopped Davis on April 29, they thus knew that: (1) Davis had just rendezvoused with a suspected drug dealer, Presley, whom the police had already linked to over 100 kilograms of cocaine; (2) when the police had seen Davis and Presley together earlier that day, Tide boxes were "on the hood or tailgate" of Davis's car; (3) Tide boxes used as drug packaging material had been found in the December 1998 search of Presley's drug house; and (4) the officers stopped four individuals after those individuals met with Presley under suspicious circumstances, and each time the officers found substantial quantities (30, 38 and 65 kilograms) of cocaine.

On this record, the officers could fairly conclude that probable cause existed, namely that there was a "fair probability that contraband or evidence of a crime [would] be found" in Davis's car. *Illinois v. Gates*, 462 U.S. 213, 238 (1983). *See id.* at 243 n.13 (noting that probable cause "requires only a probability or substantial chance of criminal activity, not an actual showing of such activity"); *see also Ornelas v. United States*, 517 U.S. 690, 700 (1996) (officer "may draw inferences based on his own experience"); *United States v. Caicedo*, 85 F.3d 1184, 1193 (6th Cir. 1996) (consideration may be given to the particular experience of the officers conducting the search). Nor need the officers have established conclusively whether Davis or Presley drove away with the two Tide boxes the officers had seen on the hood or tailgate of Davis's Range Rover. If, as the officers legitimately surmised, they had just witnessed a drug deal, the deliverer of the Tide boxes was as apt to have evidence of a crime as the receiver of them.

In the end, it took no leap of inferential faith for the officers to conclude that the fourth car leaving a suspicious meeting with Presley, like the previous three, would also be carrying contraband, which is why the case law pertaining to warrantless searches of automobiles permits searches supported by a similar amount of information. *See Maryland v. Dyson*, 527 U.S. 465, 465–66 (1999) (holding that probable cause supported police search of a vehicle when a "reliable confidential informant" told officers that "a rented red Toyota" with a particular license number would contain drugs); *Labron*, 518 U.S. at 939 (police had probable cause to search the trunk of a car when they "observed respondent Labron and others engaging in a series of drug transactions on a street in Philadelphia"); *United States v. Ross*, 456 U.S. 798, 800–01 (1982) (police had probable cause to search a car upon receiving a tip from a reliable informant that an individual was selling narcotics kept in the trunk of the car); *United States v. Pittman*, 411 F.3d 813, 817 (7th Cir. 2005) ("When both occupants bolted and one was discovered to have an arrest warrant outstanding against him, the police had probable cause to believe that a search of the car would turn up contraband or evidence of [a] crime."); *United States v. Jouett*, No. 03-3214, 2004 U.S. App. LEXIS 2001, at *5–6 (6th Cir. Feb. 5, 2004); *United States v. Fofo*, Nos. 99-3654/99-3973, 2002 U.S. App. LEXIS 10285, at *13–14 (6th Cir. May 24, 2002); *United States v. Brookins*, 345 F.3d 231, 236 (4th Cir. 2003) (officers had probable cause to search a car when a reliable informant told them that the defendant generally made narcotics deliveries on a particular route and the officers saw the defendant pass a package to another individual); *United States v. Burton*, 288 F.3d 91, 100–01 (3d Cir. 2002) ("Because the Task Force observed Burton leave what they thought to be a drug deal and place the results of that transaction in his trunk, probable cause existed to conclude that the [car] itself was involved in an illegality.").

Nor is this a case like *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979), where the Court noted that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." Here the two super-sized Tide boxes at a minimum provided the "more" evidence that was needed on top of Davis's suspicious association with a suspected drug dealer. *See, e.g.*, *Burton*, 288 F.3d at 100; *United States v. Pace*, 898 F.2d 1218, 1240–41 (7th Cir. 1990) (noting that although "mere propinquity, *without more*," is insufficient to support probable cause, the fact that the defendants were seen leaving "rooms in which the police found large amounts of either cocaine or money" and the defendants were left alone at a home "with [ ] money and cocaine out in the open" established that police had probable cause

to arrest them); *United States v. Valencia*, 913 F.2d 378, 383–84 (7th Cir. 1990) (noting that although "mere association with a drug dealer was not enough to create probable cause [to arrest the defendant] absent other circumstances indicating" involvement in criminal activity, the defendant's "apparent concern with secrecy . . . provided the additional fact needed"). When both Davis's and Presley's cars proceeded onto Interstate 94 heading east into Indiana, the officers need not have eliminated the possibility that they were engaged in the entirely lawful, but rare, act of interstate clothes laundering.

Although this analysis establishes that the officers had probable cause to search Davis's car immediately and to detain it at the start of the encounter, that does not end the inquiry. Whether because of an abundance of caution, *see* JA 244, 1056 (officer stating to another officer that she would run the first dog sniff "to establish *more* [ ] probable cause") (emphasis added), or because they believed they lacked probable cause, the officers elected not to search the car immediately and requested a drug-sniffing dog instead. Two things then happened: (1) time passed and (2) Rocky (the first dog) failed to alert after sniffing the car. Neither development, however, eliminated the right to search the vehicle.

Doubtless, the passage of time is critical to the reasonableness of a *Terry* stop, *see Place*, 462 U.S. at 709, but it is less important where the police already have probable cause to search property. "For constitutional purposes, [there is] no difference between on the one hand seizing and holding a car before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant." *Chambers v. Maroney*, 399 U.S. 42, 52 (1970). Indeed, "there is little to choose in terms of practical consequences between an immediate search without a warrant and the car's immobilization until a warrant is obtained." *Id.*; *see also Place*, 462 U.S. at 701 ("Where law enforcement authorities have probable cause to believe that a container holds contraband or evidence of a crime, but have not secured a warrant, the Court has interpreted the [Fourth] Amendment to permit seizure of the property, pending issuance of a warrant to examine its contents, if the exigencies of the circumstances demand it or some other recognized exception to the warrant requirement is present."); *United States v. Chadwick*, 433 U.S. 1, 13 n.8 (1977) (permitting detention of footlocker based on probable cause); *United States v. Respress*, 9 F.3d 483, 488 (6th Cir. 1993) (sanctioning a ten-hour delay in obtaining a warrant because "this was not an unreasonable length of time for preparing an affidavit, submitting it to a magistrate, having it reviewed, and getting the warrant issued"); *United States v. Grosenhider*, 200 F.3d 321, 330 n.10 (5th Cir. 2000) (noting that "the holding [in *Place*] is inapposite here because there was probable cause from the inception of the computer's detention, and the four or five hour duration of the detention until the warrant was procured was plainly reasonable"); *United States v. Martin*, 157 F.3d 46, 54 (2d Cir. 1998); *United States v. Rivera*, 825 F.2d 152, 158 (7th Cir. 1987). As these cases illustrate, the delay before the search occurred does not invalidate the search given that the officers had probable cause, not reasonable suspicion, to hold the car.

Precedent also generally establishes that a dog's failure to alert does not by itself destroy probable cause. Illustrative of the cases is then-Judge Breyer's opinion in *United States v. Jodoin*, 672 F.2d 232 (1st Cir. 1982), which holds that a "dog's failure to react does not . . . destroy the 'probable cause' that would otherwise exist. It is just another element to be considered." *Id.* at 236; *see also id.* at 234 (holding that officers' actions did not violate the Fourth Amendment when, supported by probable cause, they held defendant's suitcase for several days, even though "a detector dog sniffed the suitcase but the dog did not signal the presence of narcotics"). Our circuit, in an unpublished disposition, has upheld the detention of a suitcase although "[n]either [of two] dog[s] alerted to the bag" before a dog named "Pete alerted positively to the bag." *United States v. Stephens*, No. 96-6551, 1997 U.S. App. LEXIS 33049, at *7–8 (6th Cir. Nov. 14, 1997). The *Stephens* panel noted that the defendant had used dryer sheets to mask the odor of the drugs, *see id.* at *8 n.2; *United States v. 141,770.00 in United States Currency*, 157 F.3d 600, 604 n.4 (8th Cir. 1998) ("The wide-spread use of scented dryer sheets to mask the smell of illegal narcotics is well

documented in the decisions of the Courts of Appeals."), and reasoned that the defendant's lies to an officer and her drug-courier profile independently gave the police "probable cause to believe that [the] defendant's luggage contained contraband at the time it was seized and detained," *Stephens*, 1997 U.S. App. LEXIS 33049, at *11–12; *see also United States v. Lartigue*, Nos. 93-5356/93-5369, 1994 U.S. App. LEXIS 9342, at *14–15 (6th Cir. Apr. 26, 1994) (noting that the defendants "cite no authority in support of th[e] proposition" that "the failure of [the] canine 'Pete' to alert on the bag negated the existence of probable cause" and holding that "the failure of a dog to alert does not nullify the officers' suspicions"); *United States v. Vidal*, No. 87-5952, 1988 U.S. App. LEXIS 3374, at *4–5 (6th Cir. Mar. 17, 1988) (rejecting defendant's argument that "once the narcotics sniffing dog registered a negative response to the existence of drugs, any probable cause finding was destroyed").

In a variety of factual scenarios, other courts have reached similar conclusions. *See United States v. Williams*, No. 03-51239, 2005 U.S. App. LEXIS 4493, at *5 (5th Cir. Mar. 18, 2005) (holding that, "[u]nder the[] circumstances, the failure of the drug dog to alert did not deprive the officers of probable cause to search the vehicle"); *United States v. Ramirez*, 342 F.3d 1210, 1213 (10th Cir. 2003) ("We will not require investigators to cease an otherwise reasonable investigation solely because a dog fails to alert, particularly when we have refused to require that a dog sniff test be conducted at all."); *United States v. Gill*, 280 F.3d 923, 926 & n.3 (9th Cir. 2002) (denying defendant's suppression motion although a drug "dog did not alert" and noting that drug dogs "are not trained to detect PCP or methamphetamine due to the risk these substances pose to the dogs"); *United States v. Glover*, 104 F.3d 1570, 1577 (10th Cir. 1997) ("[Defendant] relies on a line of cases holding that probable cause is established once a drug dog alerts on a package for the mistaken proposition that absent such an alert, officers are not entitled to detain the package any further. Contrary to [defendant's] assertion, drug-detecting dogs have not supplanted the neutral and detached magistrate as the arbiter of probable cause."); *United States v. Frost*, 999 F.2d 737, 744 (3d Cir. 1993) ("When one includes both the fact that the drug sniffing dog did not alert to the suitcase and the fact that drug couriers often mask the scent of drugs in suitcases so that a drug sniffing dog will not alert, the failure to alert to the suitcase is not inconsistent with the substantial probative thrust of information which [the officer] did include [in the warrant]."); *United States v. Sullivan*, 625 F.2d 9, 12 (4th Cir. 1980) (upholding detention when a "dog did not show a 'full alert'" but "did show an interest in one blue bag"); *McKay v. State*, 814 A.2d 592, 599 (Md. Ct. App. 2002) (holding that "a drug sniffing dog's failure to detect drugs does not automatically negate probable cause"); *State v. Siluk*, 567 So.2d 26, 28 (Fla. Ct. App. 1990) ("We do not accept the argument that the failure of the local narcotics dog to 'alert' to the luggage neutralized the probable cause flowing from [a prior] alert."); *cf. United States v. Guzman*, 75 F.3d 1090, 1096 (6th Cir. 1996) (noting that a "dog's interest in defendant Guzman's bag" could be taken into account "when determining whether the totality of the circumstances established probable cause to seize [the] defendant"); *United States v. Spetz*, 721 F.2d 1457, 1464 (9th Cir. 1983); *Schmid v. State*, 615 P.2d 565, 577 (Alaska 1980).

These cases reveal a near universal recognition that a drug-sniffing dog's failure to alert does not necessarily destroy probable cause, and ample reasons support this approach. Canine searches are not infallible, for one. *See Illinois v. Caballes*, 125 S.Ct. 834, 839 (2005) (Ginsburg, J., dissenting) (collecting lower-court cases indicating that dogs falsely alert between 7% and 38% of the time). For another, the evidence of drug trafficking that the officers expected to find in Davis's car does not invariably overlap with the evidence of drug trafficking that the average drug-sniffing dog will notice. Here, for example, Davis's car ended up with $705,000 in United States currency as well as documents connecting Davis to Presley. Davis has offered no good reason why the failure of a drug-sniffing dog to alert here undermines evidence of probable cause arising from a two-party drug-trafficking transaction in which it frequently will be the case that one party leaves with money while the other leaves with drugs. For a final reason, making it easier for probable cause to dissipate due to a failed investigative technique may induce officers to be *less* cautious and to search more

cars before exhausting preliminary investigative techniques.  If an officer has probable cause to search a car immediately, why risk the possibility that an individual has done a particularly good job of masking the scent of drugs?  Better to search the vehicle without calling for a dog sniff.  And the principle extends beyond the dog-sniff context.  Why, to take just one other example, conduct a breathalyzer test—which may be fallible for reasons similar to a dog sniff, *see Marshall v. Columbia Lea Reg'l Hosp.*, 345 F.3d 1157, 1161 (10th Cir. 2003)—if a driver appears visibly intoxicated? Better, an officer might conclude, to arrest first and perform additional investigations later.

The only case that Davis has cited in support of his position, *United States v. Jacobs*, 986 F.2d 1231 (8th Cir. 1993), does nothing to derail this train of analysis.  In *Jacobs*, the Eighth Circuit held that a warrant application stating that a dog had shown an interest in the defendant's package but omitting the fact "that the dog failed to alert to the package" did not set forth sufficient facts to "support probable cause."  *Id.* at 1235.  In reaching this conclusion, the court noted that, apart from the inconclusive dog sniff, the evidence in support of probable cause was limited to the facts that the sender of the package had delivered it just before Federal Express shipped its packages, did not know the local zip code and paid for the mailing in cash.  *See id.* at 1232–33.  I agree with the Eighth Circuit that "[w]hile [this] information . . . , plus the fact that the dog showed an interest in the package, might have provided reasonable suspicion that it contained contraband, more is needed" to find probable cause.  *Id.* at 1235.  And that "more" is precisely what we have in this case.  In the final analysis, I would conclude that under these particular circumstances—where the police have directly observed an individual appear to exchange large detergent boxes with a suspected drug dealer in a manner that is consistent with past surveillance that has led to the capture of large quantities of cocaine on several occasions—the police did not lose probable cause because of a failed dog sniff.

I would affirm Davis's and Presley's convictions and remand to the district court for resentencing.