RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

File Name: 06a0093p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

UNITED STATES OF AMERICA,

　　　　　　　　*Plaintiff-Appellee,*

　　　*v.*

JAIME PEREZ (04-5440); WALTER RHODES
(05-5373),

　　　　　　　　*Defendants-Appellants.*

Nos. 04-5440; 05-5373

>

---

Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.
No. 02-00165—Thomas A. Wiseman, Jr., District Judge.

Argued (05-5373): January 18, 2006
Submitted (04-5440): January 26, 2006

Decided and Filed: March 14, 2006

Before: GUY, SUTTON, and McKEAGUE, Circuit Judges.

---

### COUNSEL

---

**ARGUED:** Lacey T. Smith, Louisville, Kentucky, for Appellant. Paul M. O'Brien, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee. **ON BRIEF:** Lacey T. Smith, Louisville, Kentucky, Peter J. Strianse, TUNE, ENTREKIN & WHITE, Nashville, Tennessee, for Appellants. Chasity F. Goodner, Robert Anderson, ASSISTANT UNITED STATES ATTORNEY, Nashville, Tennessee, for Appellee.

---

### OPINION

---

RALPH B. GUY, JR., Circuit Judge. Defendants Jaime Perez and Walter Rhodes both appeal from the district court's denial of their respective motions to suppress evidence. They challenge the stop of the Cadillac Escalade EXT in which they were both traveling, and the search of the unoccupied Chevrolet Tahoe from which 30 kilograms of cocaine were seized. Defendants each challenge the legality of the stop, the scope and length of their detention, and the search of the Tahoe. After review of the record and the arguments presented on appeal, we affirm.

1

**I.**

Rhodes and Perez were charged, along with Mario Flores, Jaime Barrera, Sean Starks, Darren Montgomery, and William Johnson, in a two-count indictment with having possessed with intent to deliver 5 kilograms or more of cocaine on September 10, 2002, and having conspired to possess with intent to deliver 5 kilograms or more of cocaine on September 9 and 10, 2002. Flores pleaded guilty, and Barrera was severed from the other defendants because he had not been apprehended. The remaining defendants, Perez, Rhodes, Starks, Montgomery, and Johnson, filed a number of pretrial motions seeking severance and the suppression of evidence obtained in violation of the Fourth Amendment.

After an evidentiary hearing and supplemental briefing, the district court denied all of the defendants' motions to suppress for the reasons stated in the order entered on June 27, 2003. Perez entered a conditional plea of guilty to the conspiracy count, reserving the right to appeal the decision on the suppression motions. After a joint trial held in October 2003, Rhodes was convicted on both counts while Starks, Montgomery, and Johnson were acquitted. Perez was sentenced on February 18, 2004, to a term of 135 months in prison and 5 years of supervised release. Rhodes was sentenced on February 17, 2005, to concurrent terms of 20 years in prison and 10 years of supervised release. These appeals followed.

**II.**

On appeal from a decision on a motion to suppress evidence, we review the factual findings for clear error and the legal conclusions *de novo*. *United States v. Dotson*, 49 F.3d 227, 229 (6th Cir. 1995). When reviewing the denial of a motion to suppress, this court must consider the evidence in the light most favorable to the government. *United States v. Smith*, 263 F.3d 571, 581 (6th Cir. 2001); *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (*en banc*). Determinations regarding reasonable suspicion and probable cause generally should be reviewed *de novo*, while giving "due weight" to the factual inferences drawn by the district court. *Ornelas v. United States*, 517 U.S. 690, 697-98 (1996).

**A.    Facts**

**1.    September 9**

On September 9, 2002, Special Agent Matt Bradford, a DEA agent working in Nashville, Tennessee, took a call from Special Agent Shane Kelly, a DEA agent from Houston, Texas, requesting assistance with an ongoing investigation into large-scale drug trafficking that possibly involved deliveries of cocaine or marijuana to the Middle District of Tennessee. Kelly explained that information from a confidential source led them to believe a pearl-white 2002 Cadillac Escalade EXT with temporary Kentucky license plates was involved in the distribution of drugs and might be in Tennessee for that purpose. A court order had been obtained in Texas authorizing the installation of an electronic tracking device on the Escalade, but the device had stopped working. A second court order was issued authorizing "OnStar" to use its global positioning system to find the location of the Escalade. Kelly requested that DEA agents in Nashville conduct "loose surveillance" of the Escalade and attempt to retrieve the non-functioning tracking device. Bradford advised Nashville's acting resident agent, Billy Joe Mundy, Jr., who agreed to provide assistance.

Later that day, Kelly advised that the OnStar system had located the Escalade in Nashville. Mundy and two other agents met near that location in the parking lot of a Residence Inn. There they spotted a pearl-white Escalade EXT, which had a covered truck bed and temporary Kentucky plates. A short time later, they watched as three Hispanic males, later identified as Perez, Flores, and Barrera, got into the Escalade and left the hotel parking lot. The agents followed in separate cars. No illegal activity was observed, but the agents testified that the Escalade drove erratically in a

manner that suggested an attempt to evade surveillance. After several maneuvers, the Escalade turned suddenly into a gas station where Barrera got out to speak with a Hispanic female standing by a car with its hood up. Once they spoke, she closed the hood and left. The agents followed her to a residential area and ended their surveillance. Mundy and Bradford returned to the Residence Inn later that evening, spotted the Escalade backing out of a parking spot in front of Room 1024, and decided to return in the morning.

### 2.    September 10 Surveillance

When agents arrived at the Residence Inn at 11:00 a.m. on September 10, the Escalade was parked facing Room 1024. Special Agents Jose Ramirez, James Hale, and John Hardcastle took up surveillance in separate cars but were in constant communication both with each other and with Mundy who monitored events from the DEA office. At about 11:15 a.m., Ramirez observed Perez put a large black suitcase and two duffle bags into the rear of the Escalade. About five minutes later, Perez and Flores got into the Escalade, drove around to the opposite side of the hotel, and parked facing Room 213. Agent Hale watched as Perez and Flores went into Room 213 for about a minute and returned, each carrying a duffle bag. They placed the bags in the passenger area of the Escalade and drove to the front of the hotel. The Escalade idled in front of the hotel office until about 11:45 a.m., when someone came out and got into the Escalade. When the Escalade began backing up, Ramirez drove away to avoid being detected.

Agent Hardcastle was waiting to follow the Escalade when it left the hotel parking lot. After several minutes passed without it coming into view, he drove into the parking lot to investigate and found the Escalade parked adjacent to a brown 2000 Ford Explorer. Perez and Flores were standing next to the vehicles talking to two black males who were later identified as Starks and Montgomery. Hardcastle watched as Perez opened the tailgate of the Escalade. A black male, later identified as Rhodes, carried two duffle bags around and put them in the back, and Perez closed and locked the tailgate. After a brief conversation, Perez, Rhodes, Flores, and Starks got into the Escalade, while Montgomery and Johnson got into the Explorer. Then Flores and Starks got out of the Escalade, opened the tailgate, and each took out one of the duffle bags that had just been moved by Rhodes. They carried the bags to a green 1996 Chevrolet Tahoe that was parked 30 feet behind the Escalade. The duffle bags bowed as they were carried, and appeared to contain something heavy. The duffle bags were put in the back seat of the Tahoe, and Starks pointed a device at the Tahoe and activated the locks as they walked back to the Escalade. This time, Starks got into the Explorer and Flores got into the Escalade. Then the Escalade and Explorer left the hotel together.

Hardcastle, a 16-year veteran of the DEA, believed that they had observed an illicit drug transaction involving a "dead drop" of drugs or money that would be retrieved from the Tahoe by someone else. He suspected that the men had stayed in one room and kept the drugs or money in the second "dead" room; that inspection of the drugs had occurred during the five-minute break in surveillance just before he discovered the Escalade and Explorer together; and that the bags left in the Tahoe contained drugs or money related to drug trafficking. Mundy testified that when he heard that Perez and Flores had quickly retrieved two duffle bags from Room 213, he believed a drug transaction was about to take place and asked that drug interdiction units be sent to the area. After Hardcastle relayed that the two duffle bags had been moved from the Escalade to the Tahoe, Mundy directed that the Escalade and Explorer be stopped by uniformed officers assigned to the 20th Judicial District Drug Task Force Interdiction Unit. Mundy indicated that they should look for a traffic violation, but conceded that he intended an investigatory stop would be made even if there was no violation.

### 3.    Stop and Detention

The Escalade and Explorer were stopped a short distance from each other and less than five minutes from the Residence Inn.  Officer Samuel Johnson stopped the Escalade for failing to use a turn signal when changing lanes.  Perez, the only individual whose identity was known at the time, was the driver and registered owner of the Escalade.  Rhodes and Flores were passengers.  Officer Johnson asked where they were coming from and obtained identification from the occupants, which was relayed to the DEA agents.  Johnson wrote a warning citation and prepared a consent to search form while waiting for backup to arrive.  Perez was given the warning citation, asked whether he had drugs or weapons, and asked if he would consent to a search of the Escalade.  Perez gave oral and written consent to search about 15 minutes after they were first stopped.  Nearby, Officer Roy Lee stopped the Explorer; obtained identification from Montgomery, Starks, and Johnson; asked the occupants some routine questions; and obtained Montgomery's written consent to search the Explorer.  The occupants of each vehicle were detained near the stop, sitting and conversing in the shade, while the consensual searches were conducted.

A drug dog brought to the scene did not alert to either vehicle, and thorough hand searches of both vehicles and their contents revealed no contraband.  A keyless entry device was found in the console of the Escalade, but did not seem to operate the Escalade.  It was of interest because Hardcastle had seen one used to lock the Tahoe.  Agent Bradford asked Perez and then Flores about it, and each denied that it belonged to him.  Bradford questioned Rhodes about the device and whether the Tahoe was his.  Although Rhodes acknowledged that the device belonged to the Tahoe and that the Tahoe was his, he would not answer when Bradford pressed him to give consent to search the Tahoe.  There is no dispute that at about 12:30 p.m., having completed the consensual searches, Officers Johnson and Lee consulted with the DEA and were told to hold the occupants while the investigation continued at the hotel.

### 4.    Investigation at the Hotel

At about noon, shortly after the Escalade and Explorer left the Residence Inn, Agent Mundy arrived and began directing the investigation.  Mundy first had Agent Hale confirm that the duffle bag visible through the window of the Tahoe was one he had seen being carried out of Room 213.  Then Mundy sent Hale to the hotel office to obtain hotel records and access to the hotel rooms.  While Hale went to make these inquiries, a drug detection dog named "Lou" and his handler Officer Debbie Kohl arrived.  Kohl had the dog inspect the outside of the Tahoe, but the dog did not alert to the presence of drugs.  Mundy called for a second drug detection dog because he was convinced that drugs would be found in the Tahoe and believed from his experience with other "canine sniffs" that the duffle bags might not have been in the Tahoe long enough for Lou to alert.  Although Kohl was uncertain what time it was when she arrived, there was testimony that the bags might only have been in the Tahoe for about 15 minutes when Lou was first taken around the vehicle.

In the meantime, Hale did not initially receive cooperation from the hotel staff.  He had an administrative subpoena prepared by someone in the DEA office and, at 12:33 p.m., it was faxed to the hotel.  While Hale discussed with the staff whether search warrants would be necessary, a hotel manager arrived and determined that the individuals had already checked out and that Room 213 had already been cleaned.  That being the case, the manager allowed the agents access without a search warrant.  In Room 1024, agents found a receipt for Room 213 and two rolled up $1 bills with white powder residue on them wrapped in a washcloth.  The hotel records showed that Barrera provided a Texas driver's license and checked into Room 1024 on September 8, and that Flores provided a Texas driver's license and checked into Room 213 on September 9.

Sometime after 1:00 p.m., a second drug detection dog named "Turbo" and his handler Officer Wilfred Hunter arrived at the Residence Inn.  Turbo was taken around the Tahoe at about

1:30 p.m., and he alerted to the presence of drugs. Lou was brought around the Tahoe again for training purposes, and he alerted this time as well. Hunter testified that he had not been aware of the earlier dog's failure to alert, but explained that the odor of drugs has to build up inside a vehicle like smoke before it will begin to leak sufficiently to be detected by a trained drug dog. The positive alert by Turbo (and Lou on a second try) occurred about an hour after the consensual searches of the Escalade and Explorer had been completed and about 90 minutes after the initial stop.

Mundy contacted the prosecutor and was advised that there was probable cause to search the Tahoe and that a warrant would not be required. The keyless entry device did not work (apparently because the battery had been removed), so a "slim jim" was used to get into the Tahoe. The Tahoe was searched at about 1:45 p.m., and agents found 30 brick-like bundles of cocaine in the two duffle bags. Other evidence, including several cellular telephones and papers, was also seized from the Tahoe. Mundy directed that the detained individuals be arrested. They were handcuffed and taken into custody shortly before 2:00 p.m., transported to the DEA office, and questioned.

### 5. District Court's Findings

Although the district court's order addressed a number of issues raised by the various defendants' motions to suppress, we focus on those findings that are directly challenged by Perez and Rhodes in the instant appeals. Specifically, Rhodes and Perez each contest the district court's findings (1) that the stop of the Escalade was justified by reasonable suspicion that the defendants had been or were engaged in a drug transaction; (2) that the scope and length of the detention did not render the stop unreasonable because there was continuous investigative activity aimed at confirming or dispelling the suspicion; and (3) that the search of the Tahoe was valid because it was supported by probable cause established when the second drug detection dog alerted to the Tahoe. As for the use of a second drug dog, the district court was convinced that the first dog did not alert because the drug odor had not had sufficient time to permeate the bags and escape from the Tahoe. Emphasizing that the first dog also alerted when it was brought around the Tahoe a second time, the district court concluded that the "use of the second dog was a reasonable investigative technique under the circumstances."

### B. Stop and Detention of Escalade and its Occupants

"Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of [the Fourth Amendment]." *Whren v. United States*, 517 U.S. 806, 809-10 (1996). Because such a seizure affects the Fourth Amendment interests of all the occupants, Perez as the driver and Rhodes as a passenger may each challenge his detention during the stop of the Escalade. *United States v. Richardson*, 385 F.3d 625, 629 (6th Cir. 2004) (citing *Michigan Dep't of State Police v. Sitz*, 496 U.S. 444, 450 (1990), and *Delaware v. Prouse*, 440 U.S. 648, 653 (1979)). The dual inquiry for evaluating the reasonableness of an investigative stop requires examination of "whether the officer's action was justified at its inception, and whether it was reasonably related in scope to the circumstances which justified the interference in the first place." *Terry v. Ohio*, 392 U.S. 1, 20 (1968).

#### 1. Initial Stop

While Officer Johnson testified that he stopped the Escalade for failing to use a turn signal when changing lanes, there was also testimony that the drug interdiction unit was directed to conduct an investigative stop even if there was no traffic violation. If there is probable cause to believe a traffic violation had occurred, the officer's actual motivation is immaterial. *Whren*, 517 U.S. at 812-13; *United States v. Ferguson*, 8 F.3d 385, 391 (6th Cir. 1993) (*en banc*). An ordinary traffic stop is like an investigative detention, the scope of which is governed by *Terry* principles. *United States*

*v. Hill*, 195 F.3d 258, 264 (6th Cir. 1999). Once the purpose of an ordinary traffic stop is completed, the officer may not "further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." *United States v. Mesa*, 62 F.3d 159, 162 (6th Cir. 1995); *see also Erwin*, 155 F.3d at 822.

### a.    Traffic Violation

Defendants do not deny the failure to signal the lane change, but argue that under state law "the only time a driver must signal before changing lanes appears to be when that change will affect other vehicles." *Tennessee v. Smith*, 21 S.W.3d 251, 257 (Tenn. Ct. App. 1999) (interpreting Tenn. Code Ann. §§ 55-8-142 and 55-8-143(a)). Officer Johnson agreed that not every failure to signal a lane change would constitute a violation. Johnson conceded that although he was following the Escalade, he was not affected by its failure to signal the lane change. Johnson also testified that he did not see whether any other vehicles on the roadway were affected by the failure to signal. As a result, defendants argue that Officer Johnson did not have probable cause to make the traffic stop because a reasonable officer could not have believed the failure to signal the lane change constituted a traffic violation under these circumstances. Significantly, the government does not rely on the traffic violation to justify the stop, or point to anything that occurred *during the traffic stop* that would give rise to reasonable suspicion that the occupants had engaged or were engaging in criminal activity.

The district court did not decide whether a reasonable officer could have had probable cause to believe a traffic violation had been committed, but concluded instead that there was reasonable suspicion at the time the stop was made to believe the occupants had been or were involved in a drug transaction. We agree. Unlike cases in which an ordinary traffic stop was made in hopes of generating reasonable suspicion, *see*, *e.g.*, *United States v. Townsend*, 305 F.3d 537 (6th Cir. 2002), this case is best analyzed as an investigative *Terry* stop for which reasonable suspicion was either present or absent based on the information and surveillance that preceded the decision to have the Escalade stopped.

### b.    Reasonable Suspicion

Under *Terry*, an officer is permitted to "stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7 (1989) (quoting *Terry*, 392 U.S. at 30). Likewise, a moving vehicle may be stopped to investigate an officer's reasonable and articulable suspicion that its occupants had engaged, were engaging, or were about to engage in criminal activity. *United States v. Hensley*, 469 U.S. 221, 226-27 (1985); *United States v. Place*, 462 U.S. 696, 702 (1983). Courts must determine from the totality of the circumstances whether law enforcement had an objective and particularized basis for suspecting criminal wrongdoing. *United States v. Arvizu*, 534 U.S. 272, 273-77 (2002); *United States v. Orsolini*, 300 F.3d 724, 728-29 (6th Cir. 2002).

Perez argues that the stop was based on nothing more than constitutionally inadequate "hunches," and Rhodes contends that the agents simply observed innocent activities normally associated with checking out of a hotel. While reasonable suspicion must be based on more than "ill-defined hunches," officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" *Arvizu*, 534 U.S. at 273 (quoting *United States v. Cortez*, 449 U.S. 411, 418 (1981)). In considering the totality of the circumstances, "we must determine whether the individual factors, taken as a whole, give rise to reasonable suspicion, even if each individual factor is entirely consistent with innocent behavior when examined separately." *United States v. Smith*, 263 F.3d 571, 588 (6th Cir. 2001) (citing *Sokolow*, 490 U.S. at 9).

The factors to be aggregated in this case begin with the fact that the pearl-white Escalade EXT with temporary Kentucky plates came under surveillance at the request of one DEA office to another because it was believed it might be involved in transporting cocaine and marijuana from Houston, Texas, to the Middle District of Tennessee. That same day, the Escalade was found where OnStar indicated it would be, was seen driving in an erratic manner that suggested an attempt to evade surveillance, and was observed in an apparent rendezvous with an unidentified Hispanic female at a gas station.

These facts must be viewed in conjunction with the activities observed at the Residence Inn the next morning. First, after loading luggage into the Escalade outside Room 1024, Perez and Flores drove around the hotel, went into Room 213 very briefly, and came out carrying the duffle bags that were later retrieved from the Tahoe. This suggested to the experienced DEA agents that the second room had been used to store drugs or money, while the men spent the night in the first room. Then, after waiting outside the front office for someone to come out, the Escalade did not leave the hotel as expected. It was found a few minutes later, parked adjacent to the Explorer. The duffle bags were then moved from the passenger area to the rear of the Escalade, and the individuals spoke briefly before climbing into the Escalade and Explorer. But before leaving, Flores and Starks stepped out of the Escalade and transferred the heavy-looking duffle bags to the Tahoe. Agent Hardcastle testified that he believed that the activities they observed represented an ongoing drug transaction and that he had just witnessed a transfer of drugs or money to the Tahoe for someone else to retrieve.

Although each of the observations might individually have an innocent explanation, taking the circumstances together and giving due weight to the reasonable inferences drawn by the agents based on their experience, we are satisfied that the totality of circumstances provided an objective and particularized basis to believe the Escalade and its occupants were engaged in an illicit drug transaction. Accordingly, there was reasonable suspicion to support the request for an investigative stop of the Escalade.[1]

## 2.    Continued Detention

The second part of the *Terry* inquiry examines whether the stop was "reasonably related in scope to the circumstances which justified the interference in the first place." *Terry*, 392 U.S. at 20. [A]n investigative detention must be temporary and last no longer than is necessary to effectuate the purpose of the stop." *Florida v. Royer*, 460 U.S. 491, 500 (1983). The investigative means used should also be the least intrusive means reasonably available to verify or dispel the officer's suspicions in a short period of time. *Id*. The Supreme Court has rejected a rigid time limitation on the lawfulness of a *Terry* stop, and "emphasized the need to consider the law enforcement purposes to be served by the stop as well as the time reasonably needed to effectuate those purposes." *United States v. Sharpe*, 470 U.S. 675, 685 (1985). To assess whether a detention was too long to be justified as an investigative stop, courts should "examine whether the police diligently pursued a means of investigation that was likely to confirm or dispel their suspicions quickly, during which time it was necessary to detain the defendant." *Id*. at 686.

At the scene of the stop, Officer Johnson obtained identification from the occupants of the Escalade and within 15 minutes of the stop had issued the warning citation and obtained consent to search the Escalade. Perez does not challenge the validity of his consent; and neither Perez nor Rhodes argues that the consensual search unlawfully extended the duration of the stop. *See Erwin*,

---

[1]Defendants emphasize that no criminal activity was witnessed during the surveillance on September 9 or 10. While true, this misses the point because if any criminal activity had been observed, our inquiry would be whether probable cause existed.

155 F.3d at 823; *United States v. Burton*, 334 F.3d 514, 517-18 (6th Cir. 2003).  Rather, the question presented by both Perez and Rhodes is whether the investigative detention, assuming it was initially supported by reasonable suspicion, became constitutionally unreasonable when it continued after the consensual searches were completed.  Once officers use "all of the appropriate means available to them to allay their concerns of criminal activity," they may not further detain a suspect absent probable cause.  *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001).

        Specifically, defendants contend that the failure of the first drug dog to alert on the Tahoe served to completely dispel the reasonable suspicion such that they could not be detained after completion of the consensual searches absent a showing of probable cause.  Although not called to this court's attention by the parties, resolution of this issue merits some discussion of the recent decision in *United States v. Davis*, 430 F.3d 345 (6th Cir. 2005).  There, the majority concluded that law enforcement had reasonable suspicion to believe Davis's vehicle contained drugs and that it was constitutionally reasonable to detain the vehicle for 30 minutes while a drug detection dog was brought to the scene to confirm or dispel that suspicion.  When that drug-sniffing dog failed to alert to the presence of drugs, however, the court found the suspicions that justified the stop "were dispelled."  A second dog was called and positively alerted to the vehicle an hour later.  The subsequent search uncovered no drugs but did reveal more than $700,000 in cash, some of which was contained in large Tide detergent boxes.  Pointing specifically to evidence of the dog's training and high success rate at accurately identifying the presence of drugs, the court concluded that "there were no grounds for the police to continue to believe that the vehicle contained narcotics after the dog failed to alert."  *Id.* at 356.  "Given that the police had no reason to continue to suspect that Davis possessed narcotics, delaying Davis's vehicle an additional hour in order to permit a second examination of the vehicle by another drug sniffing dog was unreasonable.  The use of the second dog and the continued detention of Davis's vehicle served no investigatory purpose."  *Id.*

        There was evidence in this case, found by the district court to be convincing, that the agents knew how long the duffle bags had been in the Tahoe and had reason to believe that the first dog failed to alert because the bags had not been in the Tahoe long enough for the odor to escape.  Emphasizing this evidence and that the first dog also alerted on a second pass around the Tahoe, the district court concluded that calling a second drug detection dog was a "reasonable investigative technique under the circumstances."  In other words, under these circumstances, the failure of the first dog to alert to the Tahoe did not dispel reasonable suspicion that drugs would be found in the Tahoe and use of a second drug detection dog served a reasonable investigatory purpose.  Moreover, unlike in *Davis*, when the first dog failed to alert to the Tahoe, law enforcement was still diligently pursuing other lines of investigation likely to confirm or dispel the suspicion that Perez and Rhodes had or were engaged in a drug transaction.

        The record supports the district court's finding that law enforcement was engaged in continuous activity aimed at confirming or dispelling the reasonable suspicion that the transfer of the duffle bags to the Tahoe was part of a drug transaction.  About the time that Perez consented to the search of the Escalade, the first drug dog failed to alert, a second drug dog was called, and efforts were underway to obtain hotel records and gain access to the hotel rooms.  By 12:30 p.m., the investigation of the Escalade and Explorer had concluded without uncovering contraband or other evidence of illegal activity.  The administrative subpoena was faxed to the hotel at 12:33 p.m. and, at some point before the second drug dog arrived, Room 1024 was searched.  Turbo, the second drug detection dog, arrived about 1:00 p.m., was taken around the Tahoe at about 1:30 p.m., and positively alerted to the presence of drugs.  As a result, the continued detention of the defendants for the hour between the completion of the consensual search of the Escalade and Explorer and the second dog's alert to the Tahoe did not impermissibly extend the scope of the *Terry* stop.

        Even if we were to agree with defendants that the rest of the investigatory steps had been exhausted before the second drug dog alerted to the Tahoe, unreasonably extending the detention,

the exclusionary rule only requires suppression of evidence that is the fruit of the unlawful detention. *United States v. Fullerton*, 187 F.3d 587, 591 (6th Cir. 1999) (statements must be made after the detention became illegal in order to be fruit of the unlawful detention). Statements and evidence obtained during the initial stop or as a result of the consensual searches would not be implicated. The only evidence defendants specifically identify as having been illegally obtained, aside from the evidence obtained from the Tahoe, is the statement by Rhodes admitting that the Tahoe belonged to him. The record indicates, however, that this statement was elicited in the context of the detention resulting from Perez's unchallenged consent to search the Escalade. Agent Bradford, who elicited the statement, went to assist at the traffic stop, questioned the occupants, and provided names to the agent preparing the administrative subpoena. Bradford was interested in finding the keyless entry device Hardcastle had seen, and learned that there was one in the Escalade. Rhodes was questioned for a few minutes before he acknowledged that the device and the Tahoe were his. At about 12:30 p.m., Bradford attempted to gain consent to search the Tahoe from Rhodes. Whether the admission was made during or at the conclusion of the consensual search of the Escalade, it cannot be said to have been fruit of the allegedly unlawful extension of the detention. This brings us to the evidence that is the central focus of the defendants' appeals; the cocaine seized from the Tahoe.

## C.      Search of the Tahoe

Without clearly distinguishing between their theories, defendants argue for suppression of the cocaine seized from the Tahoe. On one hand, Rhodes seems to contend that the search of the Tahoe was "fruit" of the allegedly unlawful delay in the investigative stop of the Escalade. *Segura v. United States*, 468 U.S. 796, 804-05 (1984); *Murray v. United States*, 487 U.S. 533, 536-41 (1988). Whether or not the stop became constitutionally unreasonable, however, the search of the Tahoe was simply not a product of the detention of the Escalade and its occupants. *See*, *e.g.*, *Sharpe*, 470 U.S. at 683 ("It is not necessary for us to decide whether the length of Sharpe's detention was unreasonable, because that detention bears no causal relation to Agent Cooke's discovery of the marihuana. The marihuana was in Savage's pickup, not in Sharpe's Pontiac; the contraband introduced at respondent's trial cannot logically be considered the 'fruit' of Sharpe's detention.").

To the extent that Rhodes may rely on *Davis* to support this argument, such reliance is misplaced. In *Davis*, unlike this case, the second dog's positive alert on Davis's vehicle was the product of the illegal detention of that vehicle. *Davis*, 430 F.3d at 355-57; *see also Illinois v. Caballes*, 125 S. Ct. 834, 837 (2005) (explaining that a dog sniff is not the cause, but may be a consequence of an illegal detention). In contrast, while the Escalade was allegedly detained unlawfully, the Tahoe, left parked at the hotel, was the subject of the successive canine sniffs. That is, the canine sniff that provided probable cause to search the Tahoe was not a consequence of the allegedly unlawful delay in the detention of the Escalade.

Apart from the stop of the Escalade, defendants seem to also argue that the search of the Tahoe was itself a violation of the Fourth Amendment. A "search" of property occurs when one's reasonable expectation of privacy is infringed; while a "seizure" requires some meaningful interference with an individual's property interest. *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). A seizure of property may be made on less than probable cause if it satisfies *Terry*-type standards of reasonableness. *Place*, 462 U.S. at 706. A warrantless search of an automobile is permissible if probable cause exists to believe it contains evidence of a crime. *United States v. Ross*, 456 U.S. 798, 809 (1982). There is probable cause to justify a warrantless search of a vehicle once a properly trained and reliable drug detection dog alerts positively to the presence of drugs. *United States v. Hill*, 195 F.3d 258, 273 (6th Cir. 1999).

Rhodes, as the owner, had protected Fourth Amendment interests in the Tahoe. Because the Tahoe sat in the parking lot of the hotel and was not stopped, detained, or moved, no search or

seizure occurred when the Tahoe was approached. *United States v. Ludwig*, 10 F.3d 1523, 1526 (10th Cir. 1993). Nor did the canine sniffs of the exterior of the Tahoe constitute a search within the meaning of the Fourth Amendment. *Place*, 462 U.S. at 700-01. In rejecting the proposition that reasonable suspicion is required to justify using a drug dog during a legitimate traffic stop, the Supreme Court made clear that use of a well-trained drug dog does not in itself implicate any legitimate privacy interests. *Caballes*, 125 S. Ct. at 837-38. As a result, the failure of the first dog to alert to the Tahoe did not affect the lawfulness of the second canine inspection. Moreover, since there is no dispute that Turbo and Lou were well-trained and reliable drug dogs, the positive alerts provided the necessary probable cause to justify the warrantless search of the Tahoe.

Taking a different tack, Perez, whose standing to challenge the search of the Tahoe is itself doubtful, argues that he nonetheless had a protected possessory interest in the duffle bags that contained the cocaine because he was seen carrying one of them.[2] Even if we assume that Perez had a protected interest in the bags themselves, the search was lawful because an officer with probable cause to search a vehicle for drugs may inspect any item in that vehicle that could contain drugs, whether or not the item belonged to the driver, a passenger, or someone else claiming an expectation of privacy in its contents. *Wyoming v. Houston*, 526 U.S. 295, 300-02 (1999).

Accordingly, the denial of the motions by Rhodes and Perez to suppress evidence is **AFFIRMED**.

---

[2]Perez asserted that he had standing to challenge the search of the Tahoe because the keyless entry device was found in the console of the Escalade he was driving. Yet, Perez denied the device belonged to him while Rhodes, who was a passenger in the Escalade, admitted that the device was his and it went to his Tahoe. Because we find the search of the Tahoe was supported by probable cause, we need not address Perez's claim that his rights were invaded by the entry into the Tahoe.