RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 11a0097p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
—————————————

UNITED STATES OF AMERICA,
                    *Plaintiff-Appellee,*

    *v.*

RODNEY DYSON,
                    *Defendant-Appellant.*

No. 08-3944

Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.
No. 07-00023-001—S. Arthur Spiegel, District Judge.

Argued: January 20, 2011

Decided and Filed: April 20, 2011

Before: ROGERS, SUTTON, McKEAGUE, Circuit Judges.

—————————————

**COUNSEL**

**ARGUED:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Mary B. Young, ASSISTANT UNITED STATES ATTORNEY, Columbus, Ohio, for Appellee. **ON BRIEF:** Kevin M. Schad, FEDERAL PUBLIC DEFENDER'S OFFICE, Cincinnati, Ohio, for Appellant. Christopher K. Barnes, ASSISTANT UNITED STATES ATTORNEY, Cincinnati, Ohio, for Appellee.

—————————————

**OPINION**

—————————————

ROGERS, Circuit Judge. A police-dog alert on a parked car ultimately led to evidence used to convict Rodney Dyson of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). A motion to suppress the evidence was properly denied because the dog sniff did not violate the Fourth Amendment. First, because the car was not stopped by the police, there was no protected Fourth Amendment interest

1

in not having the car sniffed.  Second, in any event, reasonable suspicion supported the sniff.  Affirmance of Dyson's conviction and sentence is therefore required, as none of Dyson's remaining arguments on appeal warrants reversal.

Dyson was arrested on October 12, 2006, after fleeing from officers on foot during the search of his vehicle.  Officers were motivated to search Dyson's Nissan Maxima by a series of events following an accident on Interstate 75 in which Dyson's car was not involved.  One of the vehicles in that accident was a Chevrolet Suburban. Officer Lyons, of the Lockland, Ohio, Police Department, was the first officer to respond to the accident.  Lyons smelled a strong odor of raw marijuana when he approached the Suburban. Shortly thereafter, a third-party witness informed Lyons that, immediately following the accident, one of the Suburban's passengers left the vehicle carrying a box and walked to the top of the off ramp.  The passenger returned without the box.  Officer Lyons observed passengers remove other items from the Suburban and carry them up the off ramp.  Lyons testified that passengers often remove their personal effects from vehicles following accidents, but that it was unusual for passengers to begin unloading a vehicle immediately while showing no concern for the driver or the circumstances of the accident.

The second officer on the scene, Sargeant Reynolds, parked her cruiser at the top of the ramp to block traffic from entering I-75 while the accident was being resolved. Sargeant Reynolds approached the Suburban and confirmed that she also detected the odor of marijuana coming from the vehicle.  Because of the odor, Lyons and Reynolds agreed that a canine unit should be called to the scene to perform a dog sniff around the Suburban.  Reynolds returned to the top of the ramp to await the canine unit.  From there, she observed the Suburban's passengers placing items from the Suburban into a Nissan Maxima that was parked at a gas station at the top of the exit ramp.

When the canine unit arrived, the dog's handler, Officer Huber, determined that it would not be safe for his canine "partner," Bear, to perform a sniff on the Suburban because the vehicle was surrounded by broken glass and gasoline.  Because Lyons suspected that the passengers had removed drugs from the Suburban and placed them in

the Maxima, he asked Officer Huber to perform a dog sniff on the Maxima. Officer Lyons remained at the scene of the accident until after the dog sniff had been performed at the gas station.

Officer Huber proceeded to the gas station, where he saw the unoccupied parked Maxima. Dyson was standing about two feet from the car. Officer Huber testified that a Lockland officer was also present, but stated that it did not appear that Dyson was being detained. Huber asked Dyson if he owned the Maxima, and Dyson responded that he did. Huber then led Bear twice around the Maxima. Bear alerted to the presence of narcotics at the trunk and at the area where the left front fender meets the hood.

Officer Lyons arrived at the gas station after the dog sniff was complete. Lyons informed Dyson that Bear had alerted to the presence of narcotics and asked Dyson for permission to search the car. On direct examination, Lyons testified that Dyson consented to the search. On cross, Lyons paraphrased Dyson's response to the search request as: "He didn't really want to but we were going to anyway, so go ahead." Lyons and Huber then began to search the car. Lyons began with the trunk, and Huber proceeded to try to open the hood.

When Officer Huber attempted to release the hood, Dyson explained that because the car had been worked on, it took two people to open. Dyson said that he would need to pull up on the hood while Huber pulled the release lever inside the car. After Dyson raised the hood, he grabbed a towel-wrapped gun from the engine compartment and began to run. Officer Huber testified that he could see enough of the gun protruding from the towel to recognize it as a gun. Huber yelled "gun" and began to pursue Dyson on foot. Officer Lyons followed. The officers caught up with Dyson and arrested him. The search of the Maxima revealed a second firearm. Dyson was indicted for two counts of being a felon in possession of a firearm.

At the district court, Dyson sought to suppress the weapons, asserting that there was no justification for his stop and detention and that he had not given valid consent to a search. The district court denied Dyson's request after concluding that the Government had established at the suppression hearing that the officers had reasonable

suspicion to justify the canine sniff, which gave rise to probable cause for the search (obviating the need for consent). The district court did not question whether the officers had detained Dyson or the Maxima prior to the dog sniff.

On appeal, Dyson challenges the district court's denial of his motion to suppress on the grounds that the officers did not have reasonable suspicion for detaining him or his vehicle in order to conduct the dog sniff. This argument fails for two reasons. First, reasonable suspicion was not required because Dyson's vehicle was unoccupied and parked in a publicly accessible lot at the time the dog sniff was performed. Second, even if reasonable suspicion were needed, it was established by the circumstances leading up to the dog sniff.

Viewing the evidence in the light most favorable to the government supports the finding that neither Dyson nor the Maxima was detained prior to the dog sniff. Because no detention occurred, it is not necessary to determine whether the officers had reasonable suspicion to conduct the dog sniff, as reasonable suspicion is not required to approach parked vehicles on publicly accessible property. *See United States v. Williams*, 413 F.3d 347, 352 (3d Cir. 2005). *Williams* involved police officers who had approached a parked van in which a man was bagging marijuana. *Id.* at 349. Williams succeeded in his motion to suppress in the district court on the ground that the officers did not have reasonable suspicion that criminal activity was afoot when they approached the van. *Id*. at 350. The Third Circuit reversed, explaining that the district court had skipped a step: "Before even addressing whether the police had reasonable suspicion to approach the van, the District Court should have inquired into whether Williams had been 'seized' by the police." *Id*. at 352. Similarly here, because the Maxima was parked in a publicly accessible location, the officers were free to approach it with or without reasonable suspicion, so long as no detention was involved.

Additional evidence from the suppression hearing supports the conclusion that no detention occurred. Officer Lyons, who ultimately chose to search the Maxima, remained at the accident site, far from Dyson's vehicle, until the cars involved in the accident had been removed. During this time, the Suburban's passengers made multiple

trips from the Suburban to the Maxima to transfer packages. Officer Lyons made no attempt to stop these transfers, leaving the occupants with full dominion over the car. Nor did Lyons question the passengers about their activities or ask Sargeant Reynolds to identify or question Dyson. Further, Officer Huber testified that Dyson did not appear to be detained at the time Huber and Bear arrived at the gas station to perform the dog sniff.

It is true that the officers in this case not only approached Dyson's Maxima, but—in contrast to *Williams*—*also* conducted a dog sniff on the vehicle. However, where there is no detention, officers may conduct a dog sniff on a vehicle without reasonable suspicion that criminal activity is afoot. *United States v. Perez*, 440 F.3d 363 (6th Cir. 2006). In *Perez*, officers observed suspected narcotics traffickers load duffel bags into an unoccupied Tahoe parked in a hotel lot and then drive away in another vehicle. *Id.* at 366-67. Believing they may have witnessed a "dead drop" of drugs or money that would be retrieved by someone else, the officers called a canine unit to the scene. *Id.* at 367. The first dog did not alert to the presence of drugs in the vehicle, and another canine unit was called. The second dog alerted, and the vehicle was fully searched. This court rejected the challenge, raised by the Tahoe's owner, that the vehicle's search was a Fourth Amendment violation. We reasoned that, regardless of whether there continued to be reasonable suspicion after the first dog failed to alert, "[b]ecause the Tahoe sat in the parking lot of the hotel and was not stopped, detained or moved, no search or seizure occurred when the Tahoe was approached." *Id.* at 375. Similarly here, Dyson's car sat in the parking lot of the gas station from the time Reynolds responded to the accident until the time of the dog search. During this interval, the Suburban's passengers had continuous access to the Maxima, making clear that the vehicle itself had not been detained. The *Perez* opinion cited *Illinois v. Caballes*, 543 U.S. 405, 409 (2005), for the proposition that no reasonable suspicion is required when using a drug-sniffing dog during a legitimate traffic stop. 440 F.3d at 375. These two conclusions—that an unoccupied, parked vehicle has not been detained and that the use of a drug dog does not in itself require reasonable suspicion—together

demonstrate that officers are free to perform dog sniffs on unoccupied parked cars without reasonable suspicion.

This is supported by case law from the Tenth Circuit, which has flatly stated that "[a] dog sniff of the exterior of a vehicle parked in a public place does not require reasonable suspicion because it is not a Fourth Amendment intrusion." *United States v. Engles*, 481 F.3d 1243, 1245 (10th Cir. 2007); *see also United States v. Ludwig*, 10 F.3d 1523, 1527 (10th Cir. 1993).

Even if Dyson or the vehicle had been detained, however, the detention would have been justified by reasonable suspicion. Lyons and Reynolds were not acting on a mere hunch that the Maxima was involved in criminal activity. *See United States v. Campbell*, 549 F.3d 364, 370-71 (6th Cir. 2008) (internal citations omitted). Rather, they had a particularized basis for suspecting criminal activity based on specific and articulable facts. *Id.* Lyons testified that passengers from the Suburban began unloading the vehicle's contents immediately following the accident. He also stated that, based on his extensive experience with responding to traffic accidents, it was unusual for a vehicle's occupants to begin clearing out a vehicle so soon after an accident without showing any concern for the driver or the investigation. The passengers' quick removal of items from the Suburban and their disinterest in the driver's welfare could have raised Lyons' suspicions that the packages contained contraband that the passengers did not want to be discovered. These suspicions were all the more reasonable given the odor of marijuana coming from the Suburban.

Although it is true that Lyons only saw the direction in which the passengers were carrying the packages, he was not the only officer to respond to the accident. When Sargeant Reynolds joined Lyons at the scene, she parked her cruiser at the top of the ramp for traffic control. From there, she was able to see that the Suburban's passengers were loading packages from the Suburban into the Maxima, creating a link between the two vehicles. Considering the strong odor of marijuana, the behavior that Lyons reported was quite unusual following an accident, and the information that the passengers were loading their packages into a parked vehicle at the top of the ramp, there

was a reasonable basis for the suspicion that criminal activity was afoot.  With that reasonable suspicion, Dyson could be briefly detained for the minimally intrusive investigative use of a dog sniff on his vehicle. Therefore, Dyson's claim that the district court erred in denying his motion to suppress would be without merit even if a detention had occurred.

Dyson's brief, which was filed in January 2010, also challenges his sentence on the grounds that his Ohio conviction for obstructing official business should not have been considered in determining his base offense level or criminal history category. However, as this claim only goes to Dyson's criminal sentence, which is now complete, the claim is moot.  *Lane v. Williams,* 455 U.S. 624, 631 (1982); *United States v. Goldberg*, 239 F. App'x 993, 994 (6th Cir. 2007).  Dyson was sentenced on June 24, 2008.  Because he had spent substantial time in federal custody awaiting sentencing, he was released from prison just four months later, on October 24, 2008.  In addition to his prison term, Dyson was also sentenced to three years of supervised release.  Had that term been maintained, his sentencing claims might not be moot, since remand would carry the possibility of a reduction in his term of supervised release. *See United States v. May*, 568 F.3d 597, 602 (6th Cir. 2009).  However, in April of 2010 the district court terminated Dyson's supervised release at the recommendation of his probation officer.  Because Dyson has completely finished his sentence, his claims of error in the calculation of his guidelines range are now moot and need not be addressed further.

Following the denial of his motion to suppress, Dyson entered into a plea agreement.   As part of the plea, which the district court accepted on July 17, 2007, Dyson agreed to the forfeiture of the firearms seized in the case.  Dyson was sentenced on June 24, 2008.  After allocution, the statement of the sentence, and the *Bostic* question, the Government requested that Dyson waive any claims to personal property taken from the crime scene.  The property as to which the Government sought Dyson's waiver consisted of the Maxima itself, as well as a computer and a printer/scanner that were found in the car. The Government contended that waiver would be consistent with

the plea agreement because Dyson had agreed that he would provide substantial assistance and these items contained evidence of criminal activity.

In response to the Government's request, Dyson's attorney stated that it was unusual to put these matters in the record, and asked if he could have "a couple more minutes" to discuss the waiver with Dyson. The judge responded: "No, we're going to settle this thing right here and now." After some discussion, during which Dyson stated that the computer and printer were not his, but that he wanted to get his car back, the judge said: "I'll tell you what I am going to do. I am going to continue this thing until a quarter of 2 this afternoon. You work it out. And if it isn't worked out, we'll vacate everything and start over again with the not guilty plea and set this case for trial. Either get this worked out by quarter of 2 this afternoon or that's what is going to happen." After the attorneys revealed that they had scheduling conflicts later in the afternoon, they instead opted for a 10-minute recess to work out the issue. Following the recess, Dyson waived his interest in the vehicle and all of the items contained inside. On appeal, Dyson argues that the court overbore his will by insisting on the resolution of the seizure of items as a condition of the plea. Dyson does not seek to withdraw his plea, but instead asks that the forfeiture order be vacated.

Dyson did not raise any objection to the district court's statements at sentencing, so only plain error review applies. "A finding of plain error requires a defendant to show (1) error (2) that was obvious or clear, (3) that affected defendant's substantial rights and (4) that affected the fairness, integrity, or public reputation of the judicial proceedings." *United States v. Johnson*, 627 F.3d 578, 585 (6th Cir. 2010) (internal quotation marks and citations omitted). Dyson has not met this standard, as he has not clearly shown that the court's actions affected his substantial rights.

To the extent that the court's action allowed the Government to extract additional concessions from Dyson long after he had entered his plea and once his sentence had already been announced, Dyson may have a colorable claim of error. The Government had reached a plea agreement with Dyson, and Dyson was entitled to the benefit of that bargain. The Government emphasizes that the plea was good for Dyson both before and

after the property waiver. This is likely true, but it is also beside the point, as the Government cannot modify a plea simply because the terms it adds do not make the plea onerous. The Government further argues that Dyson had a right to forfeit property as part of his plea, but this is also irrelevant, as it ignores the fact that he did not do so. Further, Dyson has never argued that he was not able to forfeit his interest in the Maxima. Rather, he argues that he never intended to forfeit the vehicle and that the court erroneously sanctioned the Government's overreaching by threatening Dyson's plea agreement. The fact that Dyson *could* waive his interest has no bearing on whether he was coerced into doing so.

Although the threat to the plea agreement appears erroneous, Dyson has not shown that it affected his substantial rights. The record does not reveal that the judge's statement affected either Dyson's plea or the outcome of the property dispute. Statements made by Dyson and his attorney at the hearing indicate that Dyson was prepared to waive his interest in the vehicle long before the plea was ever implicated. Dyson's counsel stated that the Government had been telling Dyson for some time that it may seek the vehicle's forfeiture. Dyson does not challenge the Government's ability to seek his waiver of any interest in the Maxima. In fact, Dyson's brief acknowledges that "the prosecution was able to attempt to forfeit other property." Therefore, the possibility of forfeiture was not raised for the first time at the sentencing hearing, and Dyson was aware that forfeiture was a possible adjunct to his conviction and sentence. Because Dyson was on notice that the Government may seek forfeiture, it does not appear that he was blind-sided by the waiver request and forced to make a snap decision in order to save his plea.

The statement regarding vacatur of the plea agreement was certainly unanticipated, but neither Dyson nor his attorney did or said anything to suggest that, in the absence of that statement, they would contest a later attempt by the Government to seek forfeiture. Dyson's counsel did not express concern about the appropriateness of the forfeiture, but only stated that it was unusual for such matters to be entered into the record. In fact, Dyson's counsel informed the court that the parties had been trying to

resolve the property issue without including it in the plea agreement (suggesting it had been on the table for over a year).  Further, when the judge asked Dyson if he waived any claims he had in the Maxima, Dyson responded: "Can I at least get my identification and wallet and license and phone back?  Do I waive that?"  This response revealed that Dyson was on the verge of waiving his claim to the Maxima before the judge postponed the proceedings or made any statement regarding the plea agreement.  Therefore, the argument that Dyson only waived his interest in the Maxima because he felt his plea agreement was in jeopardy is not supported by Dyson's own words at the sentencing hearing.  Dyson has not suggested that, given more time, he would have contested the waiver request, and he has not argued that the ultimate property disposition would be any different without the court's statement, so his claims regarding the forfeiture order do not meet the test for plain error.

The judgment of the district court is affirmed.