NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 08a0489n.06
Filed: August 13, 2008

No. 06-4419

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | ON APPEAL FROM THE UNITED |
| v. | ) | STATES DISTRICT COURT FOR THE |
| | ) | NORTHERN DISTRICT OF OHIO |
| ELWOOD LEONARD FARMER, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |

Before: COOK and GRIFFIN, Circuit Judges; and MARBLEY, District Judge.[*]

COOK, Circuit Judge. Elwood Farmer appeals the district court's denial of his motion to suppress evidence discovered during a search of his car, arguing that police unconstitutionally stopped and detained him. Because a reasonable suspicion that Farmer's car contained illegal drugs supported the stop and the detention to await a canine unit, we affirm.

I

In April 2006, two Beachwood Police Department investigators staked out the Clarion Hotel in Beachwood, Ohio, to gather evidence in an unrelated case. While there, the investigators saw four

---

[*]The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

individuals—Farmer, his son, Mark Brinkley, and Brinkley's girlfriend—engage in behavior consistent with drug trafficking.

Farmer's group arrived at the hotel in two cars—a Dodge Stratus and a Dodge Caravan—with out-of-state license plates. At check-in, Brinkley paid for a room in cash, telling the hotel clerk that he planned to share the room only with his girlfriend. Shortly after carrying luggage inside, the quartet left the hotel in one car. Meanwhile, the Beachwood investigators obtained Brinkley's name from the front-desk clerk and ran a database search. It revealed Brinkley's recent arrest in North Carolina for possessing a handgun and twelve pounds of marijuana.

About an hour after Farmer's group left the hotel, they returned to their room. Later, Brinkley walked to the parking lot, grabbed two white plastic bags from the Stratus's trunk, and sat in the Caravan. As he waited, a Volkswagen approached. Brinkley entered the Volkswagen with both plastic bags and exited a few minutes later with one bag only.

After exiting the Volkswagen, Brinkley reentered the hotel. The group soon emerged with their luggage, which Farmer and Brinkley loaded into the cars. The remaining white plastic bag went into Farmer's Stratus, as did a large pit bull that Brinkley fetched from the Caravan. (At the suppression hearing, the Beachwood investigators testified that drug dealers often use pit bulls to guard the drugs.) Brinkley and his girlfriend then drove off in the Caravan, with Farmer and his son trailing in the Stratus.

As Farmer departed, the Beachwood investigators called Ohio State Highway Patrol Sergeant Terry Helton and requested that troopers stop Farmer's vehicle. (The investigators focused on Farmer's car because it carried the remaining white bag.) In the meantime, the investigators tailed Farmer and kept Helton apprised of their location.

In response to the investigators' request, Helton dispatched Highway Patrol Sergeant Mark Neff and Trooper Todd Belcher to stop Farmer, relaying to Neff the suspicious activity at the Clarion. In about half an hour, the troopers caught up to Farmer's vehicle. Neff navigated his vehicle behind Farmer's and stopped him after observing Farmer's right tire drift, by a "half a tire's worth of line," over the fog line—the line that separates the right-hand lane from the emergency shoulder. Neff radioed for a canine unit.

After collecting Farmer's license and car-rental agreement (they turned up clean), Neff walked back to where the Beachwood investigators had stopped their vehicles and discussed with them Farmer's conduct at the hotel. As the officers talked, the canine unit arrived. Although Farmer disputes the wait time, the district court credited the testimony of multiple officers who testified that it arrived in about fifteen minutes. The dog alerted to drugs in Farmer's trunk, and the resulting search revealed a white plastic bag containing three kilograms of cocaine.

After a grand jury indicted Farmer for possessing cocaine with the intent to distribute, 21 U.S.C. §§ 841(a)(1), (b)(1)(B), Farmer moved to suppress. The district court held an evidentiary hearing and denied the motion. Farmer later pleaded guilty but preserved his right to appeal the

suppression ruling.

## II

We review the district court's factual findings on a motion to suppress for clear error and its legal conclusions de novo. *United States v. Davis*, 430 F.3d 345, 351 (6th Cir. 2005). Where, as here, the district court denied a motion to suppress, we view the evidence in the light most favorable to the government. *Id*. at 351–52.

On appeal, Farmer maintains that the police illegally stopped his vehicle and illegally detained him while awaiting the drug-detecting dog. The government counters on two grounds. First, it contends that Farmer's traffic violation—the tire-drift over the fog line—justified the stop and that reasonable suspicion arose during the stop to detain Farmer until the canine unit arrived. Second, it argues that the police reasonably suspected that Farmer carried drugs from the time he left the Clarion Hotel, justifying both an investigatory stop and detention.

Although the district court denied Farmer's motion by relying on his alleged traffic violation, we resolve this appeal solely on the reasonable suspicion that arose from Farmer's conduct at the hotel. While we do not ordinarily affirm the denial of a suppression motion on a ground unaddressed by the district court, we may do so where the alternative ground is "supported by the record." *United States v. Buckingham*, 433 F.3d 508, 514 (6th Cir. 2006); *see also United States v. Jenkins*, 92 F.3d 430, 436–38 (6th Cir. 1996) (affirming on alternative ground after holding that search was valid even

if the defendant's unaddressed allegations were taken as true); *United States v. Henry*, 429 F.3d 603, 615–16 (6th Cir. 2005) (declining to remand where government's alternative argument would fail even if the government's unaddressed allegations were taken as true); *Davis*, 430 F.3d at 364 (Sutton, J., concurring in part and dissenting in part) (urging affirmance on grounds not addressed by the district court). Here the facts supporting the police's reasonable suspicion—Farmer's suspicious conduct at the hotel—were either addressed by the district court or are uncontested. *See United States v. Taylor*, 997 F.2d 1551, 1554–55 (D.C. Cir. 1993) ("[W]e have upheld denials of suppression motions absent clear findings of fact and conclusions of law when 'we [could] readily affirm the denial' based upon an argument made by the government below and supported by evidence either uncontested or found credible by the District Court.") (internal citation omitted)). Accordingly, we proceed to explain why the features of the conduct observed by the police at the Clarion gave rise to reasonable suspicion to stop and detain Farmer.

A

*Terry v. Ohio*, 392 U.S. 1 (1968), governs traffic stops made on the basis of suspected criminal activity. Under *Terry*, a police officer may stop a vehicle if specific and articulable facts lead him to reasonably suspect that an occupant is committing a crime. *Illinois v. Wardlow*, 528 U.S. 119, 124 (2000); *see also United States v. Sokolow*, 490 U.S. 1, 7 (1989) (stating that reasonable suspicion requires "considerably less" proof than that needed for probable cause). To assess the validity of a *Terry* stop, the court considers the totality of the circumstances. *United States v.*

*Martin*, 289 F.3d 392, 396 (6th Cir. 2002).

When the Beachwood investigators testified at the suppression hearing, they articulated several concrete reasons why their surveillance at the Clarion led them to suspect that the white plastic bag in Farmer's trunk contained illegal drugs. These included:

1) Brinkley's brief meeting in the Volkswagen, after which the Volkswagen's driver took possession of the other white bag;

2) the group's departure from the hotel shortly after the Volkswagen transaction;

3) the group's short stay at the hotel;

4) Brinkley's cash payment for the room;

5) Brinkley's lie to the hotel clerk about the number of guests;

6) Brinkley's recent arrest for possessing large amounts of drugs and a weapon;

7) the group's use of two cars licensed in two different states;

8) the large pit bull; and

9) Brinkley's transferring the pit bull to Farmer's car along with the white bag.

As the cases confirm, these uncontroverted facts gave rise to something more than an "unparticularized suspicion or 'hunch'" that Farmer's vehicle carried drugs. *Terry*, 392 U.S. at 27. For example, in *United States v. Perez*, 440 F.3d 363 (6th Cir. 2006), the court held that police possessed reasonable suspicion to stop a vehicle partly because its occupants committed similar acts at a hotel, such as swapping bags and briefly visiting rooms. *Id*. at 371–72. In *Davis*, the panel found that police permissibly stopped the defendant's vehicle after observing the defendant leave a meeting with a known drug dealer carrying two suspicious packages. 430 F.3d at 354–55; *see also*

*United States v. Hill*, 195 F.3d 258, 270-73 (6th Cir. 1999) (concluding that eight factors, including a dubious explanation for a cross-country trip, nervousness, and the cash rental of a U-Haul, justified *Terry* detention); *United States v. Erwin*, 155 F.3d 818, 822 (6th Cir. 1998) (en banc) (holding that eight factors, including the driver's criminal record, nervousness, and lack of registration, justified *Terry* detention). Although, as previous panels acknowledge, the evidentiary strength this court requires to uphold vehicular *Terry* stops has not always been consistent, *see United States v. Garrido*, 467 F.3d 971, 982 (6th Cir. 2006) (collecting and comparing cases), the evidence here comfortably exceeds the reasonable suspicion threshold.

Farmer cites as shortcomings both that the troopers did not directly observe the conduct at the hotel and that they did not "even sp[eak] to the Beachwood police prior to the stop." True enough, Sergeant Neff first spoke to the Beachwood investigators *after* he stopped Farmer. But in deciding to make the stop, Neff relied on dispatched information collected by Sergeant Helton in the call from the officers on stakeout. It is well-established that reasonable suspicion "need not arise exclusively from [an officer's] own direct observations." *Dorsey v. Barber*, 517 F.3d 389, 395 (6th Cir. 2008). Rather, "it can be derived from . . . dispatch information[] and directions from other officers." *Id*. In *United States v. Hensley*, 469 U.S. 221 (1985), the Supreme Court confirmed this "commonsense" proposition when it held that officers from one jurisdiction could rely on a flyer issued by another jurisdiction—which only described the wanted suspect and the date and location of his alleged crime—so long as the first jurisdiction issued the flyer based on reasonable suspicion. *Id*. at 232. Here, the investigators, through Helton, told Neff detailed information about Farmer and

his suspicious acts at the hotel. But even assuming that the Beachwood investigators only requested that the Highway Patrol stop Farmer's vehicle, that suffices under *Hensley* because the Beachwood investigators themselves had reasonable suspicion.

Moreover, there is no doubt that the police investigated their suspicions in a reasonable time and through "minimally intrusive" means. *United States v. Place*, 462 U.S. 696, 706 (1983). Neff radioed for a canine unit immediately after stopping Farmer's vehicle, and the district court credited the police officers' consistent testimony that the canine unit arrived in about fifteen minutes. Precedent firmly establishes that a detention of this length to allow a drug-detecting dog to arrive is a permissible means of investigating suspicious conduct during a *Terry* stop. For example, in *Davis*, the panel approved the police's detention of a car for half an hour to allow a drug-sniffing dog to arrive, stating that the dog's use "was a minimally intrusive means of investigating whether the officers' suspicions that [the defendant's vehicle] contained narcotics were valid." 430 F.3d at 355. Similarly, in *United States v. Johnson*, 267 F. App'x 412 (6th Cir. 2008), the court held that "a forty-three minute [detention] is a reasonable period of time to allow police to contact a canine unit, wait for its arrival, and have a dog check for the presence of narcotics." *Id*. at 415.

Accordingly, we find that the police permissibly stopped and detained Farmer to investigate their reasonable suspicion that he carried drugs in his vehicle.

B

Having concluded that the district court properly rejected Farmer's Fourth Amendment challenge, we turn to Farmer's claim that the government violated his due process rights by failing to preserve radio communications related to his arrest. Farmer secured a district court order requiring the government to preserve these records because he believed they would demonstrate his detention's unreasonable length. But because the United States Attorney's Office failed to communicate the order to the police, both Beachwood and the Highway Patrol erased the records after thirty days, as is their routine.

To demonstrate a due process violation based on the government's failure to preserve this "potentially exculpatory" evidence, Farmer must show that: (1) the government acted in bad faith; (2) the exculpatory value of the evidence was apparent before its destruction; and (3) he could not obtain comparable evidence by other reasonably available means. *United States v. Jobson*, 102 F.3d 214, 218 (6th Cir. 1996) (distilling *Arizona v. Youngblood*, 488 U.S. 51, 56–58, (1988)).

At the least, Farmer fails to establish bad faith—i.e., "official animus" or a "conscious effort to suppress exculpatory evidence." *Jobson*, 102 F.3d at 218 (quoting *California v. Trombetta*, 467 U.S. 479, 488 (1984)). Both police units erased their radio communications under routine department policy, and all officers involved consistently testified that they did not know about the preservation order. Moreover, the government explained its failure to notify the departments: the case transferred between prosecutors and the first negligently failed to inform the second about the order. The district court accepted the officers' testimony and the prosecutor's explanation, and

Farmer fails to offer anything on appeal to cast doubt on the district court's conclusion. *See Jobson*, 102 F.3d at 218 (finding no due process violation in government's failure to prevent destruction of a tape where government was "negligent, perhaps even grossly negligent" but did not act in bad faith).

Although Farmer contends that the government's failure to follow the evidence-preservation order alone demonstrates bad faith, such a breach can stem from a good-faith mistake as well as something more sinister. Of course, the government's failure to comply exposed it to the district court's authority to sanction that non-compliance, even in the absence of bad faith or the other *Youngblood* factors. *See* Fed. R. Crim. P. 16(d)(2)(D) (authorizing a district court to "enter any . . . order that is just under the circumstances" to punish violations of its discovery orders). But the district court chose not to exercise that authority here. *See United States v. Atisha*, 804 F.2d 920, 924 (6th Cir. 1986) ("[Even if the government violated [a discovery order], it would still be within the district court's discretion to determine what the appropriate sanction—such as excluding the evidence or awarding a continuance or mistrial—should be.").

III

For these reasons, we affirm.