NOT RECOMMENDED FOR PUBLICATION
File Name: 18a0014n.06

No. 17-3363

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jan 08, 2018
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO |
| | ) | |
| RICHARD DOYLE, | ) | |
| | ) | |
| Defendant-Appellant. | ) | |
| | ) | |
| | ) | |

BEFORE: SUHRHEINRICH, GRIFFIN, and THAPAR, Circuit Judges.

SUHRHEINRICH, Circuit Judge. Richard Doyle ("Doyle") was convicted of being a felon in possession of a firearm, in violation of 18 U.S.C. § 922(g). In this appeal, he raises six challenges to the investigation and jury trial proceedings that led to his conviction and asks that we vacate that conviction. None of his six arguments are availing; we therefore affirm his conviction.

## I. BACKGROUND

The following facts were elicited during Doyle's motion to suppress hearing and his subsequent jury trial.

Around 5:00 in the morning on March 18, 2016, Officer Jeffrey Ward of the Columbus Division of Police received a dispatch call about a woman reporting that she had been threatened by a man with a gun in the area of 18th and Cleveland Avenues in Columbus, Ohio. Officer

Ward reported to the area, where the victim—Theresa Montgomery—got his attention. She explained that a young black man wearing glasses and driving a tan Cadillac had pulled up next to her and told her to get in the car. When she refused, he pulled out a gun, loaded it, and again demanded that she get in the car. At this point, she complied.[1] Once in the car, Doyle threatened to kill Montgomery. She begged for her life, and he let her out. She then ran away and called the police to report what had happened.

While Montgomery relayed this story to Officer Ward, Doyle happened to drive by in a silver Cadillac. Montgomery told Officer Ward that he was the man who accosted her and he got into his patrol car to follow Doyle. After Doyle failed to signal a turn, Officer Ward called for backup to make a felony traffic stop. Officer Ward ran his license plate to discover, among other things, that the vehicle's registered owner (Richard Doyle) had previously been convicted of a felony and had a suspended license. Once backup arrived, the officers pulled Doyle over. They then handcuffed him and placed him in the back of Officer Ward's patrol car. Officer Romans— one of the backup officers—went to the vehicle to make sure there was nothing else inside and to see "if there was anything in plain view." He found a bullet in the driver's seat and a loaded magazine between the driver's side door and the driver's seat. He then looked under the driver's seat and found a gun. Officer Romans testified that the gun was loosely placed and could be "easily rocked forward or back." At some point after Doyle was Mirandized, he told Officer Romans that he knew there was a gun in the car, but that he thought it was in the trunk.

Before trial began, Doyle moved to suppress the evidence, arguing that the officers lacked probable cause to arrest him and that there was no basis to search his car. The district

---

[1] There is some disagreement as to whether Montgomery actually got in the car. According to her testimony, she did. According to Officer Ward's testimony, when he first spoke with her, she claimed to have refused to get in the car and ran away. It is not clear which version of these facts the jury accepted; however, it makes no difference as to the outcome of this appeal.

court denied that motion, finding that Officer Ward had no reason to discredit Montgomery's story and was justified in relying on it when he made the arrest.

At the suppression hearing, it became clear that Montgomery's mental health—she was bipolar—might be an issue at trial. The district court indicated that it was not going to allow cross-examination into Montgomery's mental health unless there was "some medical way of showing that [bipolar disorder] impairs recollection, ability to perceive, all those sorts of things." As such, the district court asked that the issue be cleared up before trial started four days later. The next day, during a telephone conference, the district court again pointed out that defense counsel would need to "show that somehow her judgment was impaired." Absent such a showing, the district court declined to allow cross-examination into this topic, also noting that the case "doesn't rest on her testimony" because the reliability of her statements only related to the validity of the arrest—an issue the court had already decided. That notwithstanding, the district court gave Doyle permission to voir dire Montgomery outside the presence of the jury on this issue. Doyle declined to do so.

Doyle requested a continuance in order to gather more information on Montgomery's mental health. The district court denied Doyle's motion, explaining that it would be an inconvenience to the prospective jurors that were scheduled to arrive for the start of the trial in three days. Nevertheless, Doyle ultimately did ask Montgomery about her mental health at trial, and she responded that she only began having mental health issues after her interactions with Doyle that night.

After the first day of trial, two jurors saw Doyle outside of the courtroom after he had been handcuffed. The court spoke with the two jurors separately to determine what they had seen and whether they could remain impartial. Juror 609 did not mention the handcuffs; but,

Juror 615 said she had seen them. The district court gave Juror 615 a curative instruction that she should not read anything into the fact that Doyle was handcuffed and that she must not mention anything to the other jurors. Juror 615 responded that she would have no problem doing so and that she just assumed it was "protocol" for a criminal defendant to be handcuffed. The court then allowed both jurors to remain on the jury. In any event, before the jury retired to deliberate, both parties agreed to replace Juror 615 with the alternate juror.

Prior to deliberations, the district court instructed the jury, among other things, on the theory of deliberate ignorance. The court told them "[n]o one can avoid responsibility for a crime by deliberately ignoring the obvious. If you are convinced that the defendant deliberately ignored a high probability that his or her actions violated the law, then you may find that he or she acted knowingly." This instruction was given over Doyle's objection. The jury returned a guilty verdict and the district court entered judgment. This appeal followed.

## II. ANALYSIS

Doyle offers six arguments as to why we should vacate his conviction. First, he argues that there was no probable cause to arrest him from the outset, and that any evidence seized as a result of the ensuing search should have been suppressed. Second, he argues that the district court erred in denying him the opportunity to cross-examine Montgomery about her mental health. Third, he argues that he should have been granted a continuance in order to gather more evidence and information concerning Montgomery's mental health. Fourth, he argues that Officer Romans should not have been allowed to offer expert testimony at trial. Fifth, he argues that he was denied a fair trial after two of the jurors saw him outside of the courtroom while he was handcuffed. Sixth, he argues that the district court erred in giving the jury a deliberate ignorance instruction. We address each argument in turn.

### A. Probable Cause for Arrest

Doyle argues that the district court erred in denying his motion to suppress because the officers did not have probable cause to arrest him. A motion to suppress involves mixed questions of fact and law. *United States v. Ellis*, 497 F.3d 606, 611 (6th Cir 2007). "[W]e review the district court's findings of fact for clear error and its conclusions of law de novo." *Id.* (citation omitted).

The government presents three arguments supporting admission of the evidence against Doyle. First, it argues that Officer Ward and his colleagues had probable cause to arrest Doyle after Montgomery's 911 call and subsequent in-person identification. Second, it argues that Officer Ward was justified in pulling Doyle over after his traffic violation, at which point the bullet and magazine were discovered in plain view thereby justifying a thorough search. Third, it argues that the discovery of the gun was inevitable, as the police would have impounded the car and searched it since Doyle was driving without license.

As a preliminary matter, Doyle argues that because the district court did not rule on the plain view argument, we cannot affirm on that basis. He is wrong for two reasons. First, Doyle quotes *United States v. Farmer*, 289 F. App'x 81, 83 (6th Cir. 2008) to support this proposition. But *Farmer* stands for the exact opposite proposition. *See id.* ("While we do not ordinarily affirm the denial of a suppression motion on a ground unaddressed by the district court, we may do so where the alternative ground is 'supported by the record.'") (quoting *United States v. Buckingham*, 433 F.3d 508, 514 (6th Cir. 2006)). Second, the district court *did* consider the government's use of the plain view doctrine. It noted that "[o]nce the vehicle is stopped and the . . . defendant is arrested, then the officer who looked in the vehicle can rely on the plain view doctrine." Similarly, the district court held that the gun was properly admissible under the

inevitable discovery rule. As such, we may rely on any one of the government's proffered arguments for affirmance.

In any event, we need not proceed past the first of the government's arguments, as the police officers had probable cause to arrest Doyle based on their interactions with Montgomery. Our court has held that an eyewitness identification creates probable cause unless the arresting officer had reason "to believe that the eyewitness 'was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection.'" *Ahlers v. Schebil*, 188 F.3d 365, 370 (6th Cir. 1999) (quoting *Rainer v. Lis*, No. 92-2436, 1994 WL 33969, at *2 (6th Cir. 1994)). Because eyewitness statements are "based on firsthand observations, they are generally entitled to a presumption of reliability and veracity." *Id.* (citation omitted). We have also held, however, that eyewitness allegations may fall "short of creating probable cause absent some corroborating evidence of wrongdoing." *Wesley v. Campbell*, 779 F.3d 421, 429 (6th Cir. 2015) (citing *Gardenhire v. Schubert*, 205 F.3d 303, 317 (6th Cir. 2000)). There is tension between these two lines of cases. *Id.* However, we have clarified the issue and noted that "[p]robable cause is created only by eyewitness allegations that are *reasonably trustworthy*, and thus probable cause does *not* exist where there is an apparent reason for the officer to [discredit the witness]." *Courtright v. City of Battle Creek*, 839 F.3d 513, 521-22 (6th Cir. 2016) (quoting *Wesley*, 779 F.3d at 429-30)).

Here, Montgomery's allegations were reasonably trustworthy. She made a 911 call reporting that she had personally been threatened with a gun. She then waited until Officer Ward arrived, at which point she recounted the story to him again, in some detail. Then, during that conversation, she witnessed the same man in the same car that had very recently threatened her. This, at a time when there were rarely any cars out, according to Officer Ward. As the district

court pointed out, there was no reason to discredit anything Montgomery said during this conversation. Moreover, by the time Officer Ward pulled Doyle over he was aware that the owner of the vehicle had a prior felony conviction—which would make his possession of a firearm, in accord with Montgomery's story, a crime—and a suspended driver's license. Finally, when Doyle got out of the car, he matched the description of a young black man wearing glasses that Montgomery had provided. These facts support a finding of probable cause and the district court was not clearly erroneous in finding Montgomery's story to be reasonably trustworthy. *See id.* at 522 (noting that certain indicia of reliability justify a finding of probable cause based on an eyewitness allegation—such as the fact that the eyewitness personally observed the crime, was a victim of that crime, and identified the perpetrator of that crime).

Accordingly, we need not proceed to the government's plain view or inevitable discovery arguments.[2] Doyle's arrest was supported by probable cause and the search incident to that arrest was lawful. *See Arizona v. Gant*, 556 U.S. 332, 343 (2009) (holding that warrantless search of a vehicle "incident to a lawful arrest" is constitutional where it is "reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle") (citation omitted). Therefore, the evidence seized against him was properly admissible.

### B. Cross-Examination about Montgomery's Mental Health

Next, Doyle argues that he was denied the right to present a full defense because he was restricted from cross-examining Montgomery about her mental health issues. The "decision of whether or not to allow in evidence of a witness's mental illness falls within the broad discretion of trial courts as they balance possible prejudice versus probative value." *Boggs v. Collins*, 226 F.3d 728, 742 (6th Cir. 2000) (citation omitted).

---

[2] While we do not reach those arguments here, it bears noting that both the plain view and inevitable discovery doctrines appear to justify the district court's denial of Doyle's motion to suppress, as well.

First, Doyle was not denied this opportunity. At the pre-trial conference discussing this issue, the district court made clear that it wanted more information as to how Montgomery's personal mental health issue—bipolar disorder—affected her ability to perceive and recall. The district court also gave Doyle the opportunity to question Montgomery outside the presence of the jury on this topic, but he declined to do so. Finally, Doyle *did* elicit testimony from Montgomery on cross-examination related to her mental health. That line of inquiry stopped quickly, though, when Montgomery explained that she attributed her mental health problems to Doyle's actions that night.

But even if the district court limited Doyle's cross-examination, it did not abuse its discretion in doing so. The district court asked Doyle to demonstrate how Montgomery's bipolar disorder was probative of or relevant to anything in the case. Had he done so, perhaps the testimony could have been admitted. But he did not. In fact, the district court asked Doyle twice to establish that the bipolar disorder affected perception and gave him the chance to question Montgomery about it away from the jury, and he did neither. Thus, the district court weighed the prejudicial nature of this line of questioning against a lack of any evidence as to its probative value. To the extent that the district court limited Doyle's ability to cross-examine Montgomery as a result of this equation, it did not abuse its discretion in doing so.

### C. Denial of Continuance

Related to the previous argument, Doyle contends that the district court erred in denying him a continuance to further research the effect that Montgomery's bipolar disorder had on her judgment. "We review the district court's denial of a motion for a continuance for an abuse of discretion." *United States v. King*, 127 F.3d 483, 486 (6th Cir. 1997) (citation omitted). Doyle must show prejudice by establishing that a continuance "would have made relevant witnesses

available or added something to [his] defense" in order to demonstrate reversible error. *Id.* at 487 (citation omitted). The district court denied Doyle's request because he had known about Montgomery's condition for a month and the prospective jurors—gathered from thirty counties around Ohio—were scheduled to arrive for court in three days and a delay so close to trial would be a significant inconvenience.

Doyle argues that he should have been granted a continuance because he had "recently learned of Montgomery's mental issues" and wanted to investigate how those issues affected her perception. He also explains that he may have sought out an expert witness to discuss the effects of bipolar disorder. But Doyle knew about Montgomery's bipolar disorder a month before these discussions began and did nothing to act on that information. Accordingly, a continuance would not have opened a door previously closed to Doyle.

Doyle also argues that the district court could not rely on juror inconvenience as a basis for denying him a continuance and that, in any event, the trial had not started and the prospective jurors had not yet traveled to the courthouse. The district court did not abuse its discretion when it considered that inconvenience, *see Powell v. Collins*, 332 F.3d 376, 397 (6th Cir. 2003) (considering jury inconvenience in the continuance equation), relative to the fact that Doyle had shown no prejudice from being denied such a continuance. On the eve of trial, the prospective jurors were likely to have made arrangements to be gone for the next few days, and any postponement would have been at least somewhat inconvenient.

### D. Officer Romans's Testimony

Next, Doyle argues that the district court should not have admitted Officer Romans's testimony about the gun's position under his seat. We review a district court's decision to admit evidence for an abuse of discretion. *United States v. Kerley*, 784 F.3d 327, 336 (6th Cir. 2015).

Officer Romans testified that the gun was loosely positioned under the seat such that it would likely fall forwards or backwards with a sudden stop or acceleration of the vehicle. From this, he drew the conclusion that the gun was most likely placed there recently.[3] The parties disagree over whether this was expert or lay testimony. Lay testimony is that which is understood based on the "process of reasoning familiar in everyday life." *United States v. White*, 492 F.3d 380, 401 (6th Cir. 2007) (quoting *State v. Brown*, 836 S.W.2d 530, 549 (Tenn. 1992)). Expert testimony, on the other hand, must be gleaned from "a process of reasoning which can be mastered only by specialists in the field." *Id.* (quoting *Brown*, 836 S.W.2d at 549). Doyle argues that Officer Romans's testimony should be considered expert testimony and that, because he had not been accepted as an expert, he could not so testify. We disagree.

Officer Romans testified, in effect, that an unsecured object in a car may move if the car stops or starts suddenly. Doyle dresses this up as a physics issue requiring expert testimony. He is correct—the gun would have fallen forward or backward due to Newton's first law of motion describing inertia—but that is a principle that lay people are acquainted with. Anyone who has had the misfortune of stopping short at a red light only to spill a cup of coffee is all too familiar with this concept. And the conclusions Officer Romans drew from that information are similarly non-specialized. Where an object is precariously balanced in a car that recently came to a stop, it is not unreasonable to conclude that it must have just been put there. Thus, Officer Romans's testimony was not expert testimony and was properly admissible. *See id.* at 401. The district court did not abuse its discretion in reaching that conclusion.

---

[3] Notably, the district court struck this answer when Officer Romans gave it. However, Doyle has presented this as an issue on appeal.

### E. Jury Partiality

Doyle's next argument is that he was denied a fair trial because two jurors saw him outside of the courtroom while he was handcuffed. Because Doyle never moved for a mistrial, we review the district court's failure to grant one for plain error. *United States v. Kincaide*, 145 F.3d 771, 781 (6th Cir. 1998). Doyle must show this event resulted in "actual prejudice." *United States v. Waldon*, 206 F.3d 597, 608 (6th Cir. 2000). He simply claims that the two jurors—only one of whom participated in deliberations—were no longer able to remain impartial after seeing him in handcuffs. We disagree.

The district court held private conversations with the jurors who saw Doyle, and only one of the jurors—Juror 615—claimed to have seen the handcuffs. And Juror 615 did not participate in deliberations. Thus, regardless of whether she would have been able to remain impartial, she could not have rendered the trial unfair. Doyle responds by claiming that Juror 615 was not immediately discharged from the jury, and may have recounted what she saw to the other jurors. However, Juror 615 was instructed not to discuss the handcuffs with the jury. We presume that jurors "make sense of, and follow the instructions given them." *Francis v. Franklin*, 471 U.S. 307, 324 n.9 (1985). Absent any suggestion that Juror 615 failed to follow the district court's instructions, we assume she did. As such, there is no basis for concluding that Doyle was inherently prejudiced by this interaction.

Moreover, even had Juror 615 participated in the deliberations, she indicated to the court that seeing the handcuffs would not affect her judgment. That is sufficient to defeat a finding of prejudice. *See Waldon*, 206 F.3d at 606-08 (holding that the district court's denial of a mistrial was not an abuse of discretion where the jury foreman saw the defendant shackled, handcuffed, and placed into a police car, because he had assured the court that those events would not affect

his decision). For these reasons, the district court was not clearly erroneous in failing to grant a mistrial on this basis.

### F. Deliberate Ignorance Instruction

Finally, Doyle argues that, by giving the jury a deliberate ignorance instruction, the district court "lowered the bar necessary for the jury to convict." "We review challenges to a district court's jury instruction for abuse of discretion." *United States v. Geisen*, 612 F.3d 471, 485 (6th Cir. 2010) (citation omitted). A deliberate ignorance instruction is only warranted where evidence in the record raises deliberate ignorance as an issue. *Id.* at 486. The prosecution relied on a theory of actual knowledge, arguing that Doyle used the gun to coerce Montgomery into his car. But Doyle introduced evidence to suggest that he lacked actual knowledge of his possession of the gun. The defense elicited testimony from Doyle's fiancé, who explained that the weapon was hers and that she had been the one to place it underneath the driver's seat earlier in the day. Doyle also said he thought the gun was in the trunk of the car, indicating a lack of actual knowledge. Because Doyle presented evidence suggesting he lacked actual knowledge that he possessed the gun, a deliberate ignorance instruction was justified and the district court did not abuse its discretion in giving it. *Id.*

Moreover, even if the deliberate ignorance instruction was improperly given, the error was harmless. Along with the instruction, the district court cautioned that "[c]arelessness or negligence or foolishness on the defendant's part is not the same as knowledge and is not enough to convict." The district court further instructed that the jury "must be convinced beyond a reasonable doubt that the defendant was aware and believed that there was high probability that his actions violated the law and that the defendant deliberately closed his eyes to what was obvious." With these instructions, the district court did not lower the burden of proof. *See, e.g.*,

*United States v. Mari*, 47 F.3d 782, 785-86 (6th Cir. 1995) (holding that the same jury instruction used by the district court here required a finding of "positive knowledge" and thus any error in giving it was harmless). Thus, the deliberate ignorance instruction did not harm Doyle.

### III. CONCLUSION

For these reasons, the judgement of the district court is **AFFIRMED**.